**UNITED STATES of America, Appellee,**

v.

**GARCIA, et ano, Defendants,**

**Jeffrey Camacho, Defendant–Appellant.**

**No. 326, Docket 89–1304.**

United States Court of Appeals,
Second Circuit.

Argued Oct. 31, 1989.

Decided April 9, 1990.

Abraham L. Clott, New York City (The Legal Aid Soc./Federal Defenders Services Unit, of counsel), for defendant-appellant.

Kerry A. Lawrence, New York City, Asst. U.S. Atty., S.D.N.Y. (Benito Romano, U.S. Atty., S.D.N.Y., Vincent L. Briccetti, Asst. U.S. Atty., of counsel) for appellee.

Before VAN GRAAFEILAND, PIERCE and PRATT, Circuit Judges.

GEORGE C. PRATT, Circuit Judge:

Jeffrey Camacho appeals from a judgment of the United States District Court for the Southern District of New York, Charles M. Metzner, *Judge*, convicting him after trial of distributing three vials of cocaine base, commonly known as "crack", in violation of 21 U.S.C. §§ 812, 841(a)(1), 841(b)(1)(C), and 18 U.S.C. § 2, and sentencing him under the United States Sentencing Guidelines to a twenty-month term of imprisonment, to be followed by a three-year term of supervised release, and the mandatory assessment. For the reasons that follow, we affirm.

## BACKGROUND

On December 20, 1988, Camacho and another individual were arrested for selling three five-dollar vials of "crack" to an undercover officer of the New York City Police Department. A police chemist weighed the "crack" in two batches on a scale that measured weight in grains, reporting that the first batch weighed 1.4 grains while the second weighed 2.6 grains, for a total of four grains. Camacho was indicted and later convicted by a jury of distributing a Schedule II controlled substance.

Before the sentencing hearing, Camacho and his attorney were provided with a copy of the probation department's presentence investigation report ("PSI"), as required by Fed.R.Crim.P. 32(c)(3)(A). Because the sentencing guidelines measure relatively small amounts of "crack" in milligrams rather than in grains, the probation department used the table at U.S.S.G. § 2D1.1 to convert the four grain amount found by the police chemist into 259.2 milligrams— exactly 9.3 milligrams over the line separating offense levels 12 and 14. Based on this conversion, the report proposed a base offense level of 14, for crimes involving at least 250 milligrams but less than 500 milligrams of "crack", rather than a base offense level of 12, for crimes involving less than 250 milligrams of "crack". In practical terms, raising Camacho's guideline

range two levels increased the sentencing range by six months.

In a letter to the court, defense counsel objected to the manner in which Camacho's offense level had been calculated. Specifically, counsel argued that because the initial weighing of the drugs had been in grains, "a larger rougher measure" than milligrams (one grain equals 64.8 milligrams), it was possible that any rounding upward by the police chemist would "distort the actual weight enough to change the base offense level." Counsel requested the court to "direct that the substance be re-weighed on equipment sensitive enough to measure the actual milligram weight."

When defense counsel raised this issue at the sentencing hearing, the follow colloquy ensued:

THE COURT: Mr. Davison, do you have anything to say before the court imposes sentence on Mr. Camacho?

MR. DAVISON: Yes, your Honor.

First, with respect to the presentence report, I submitted a letter to your Honor and copies to probation and the government indicating our quarrel with the method on how the weight was ascertained in this case. It seems to me that if the guidelines attach significance to milligram weights, that the narcotics in cases like this ought to be weighed on equipment that is discriminating enough to determine the actual milligram weight.

We have a situation here where it was measured in grains which is a significantly larger, rougher measure and we—

THE COURT: Wait, wait. Where do you get the idea that it is a larger, rougher measure?

MR. DAVISON: A grain is a lot more than a milligram.

THE COURT: It was a definite unit of weight and it can be definitely and definitively and separately determined. Whether it is larger or rougher doesn't mean anything. It is an established unit of weight.

MR. DAVISON: Well, your Honor, it is my understanding that the procedure that was used measures to a tenth of a grain, it does not measure to any more to

the decimals beyond that, but that's why the milligram weights lie.

THE COURT: Where did you find that out, that it measures—it doesn't say that in your letter, that's true?

MR. DAVISON: I have a copy of the chemist's report, your Honor, which states weights to a tenth of a grain. And I have seen any number of these police laboratory reports and that's what they measure to, a tenth of a grain. A tenth of a grain is approximately 6.5 milligrams. 6.4 and some digits.

THE COURT: So take the worst script, you still end up with over the 250.

MR. DAVISON: Your Honor, we don't know, or to what extent those are rounded figures.

If each tenth of a grain that's represented on the lab report is only 2.5 milligrams shy, then we would be below 250 milligrams.

THE COURT: A tenth of a grain overall, isn't it?

MR. DAVISON: Your Honor, they measure two separate samples, as I understand it. One came out to 1.4 grains, the other came out to 2.6 grains. I guess what I am suggesting is my belief that this is similar to measuring in cups versus tablespoons or something. If a cup is shy a couple of teaspoons, it is still a cup and it is only because the conversion places us so close to the boundary line that the issue arises. There is a difference between a guideline of 18 to 24 months versus 24 to 30 months. It is of obvious significance to my client and, quite frankly, it is the first time I have had a case in which we were so close to the line, but it is of significance here because we're only slightly above the boundary line that's set forth in the drug tables.

THE COURT: Well, I rule against you on that argument. I don't think it makes any difference.

After rejecting an unrelated upward adjustment recommended by the PSI, the court imposed a sentence of 20 months' imprisonment, to be followed by a three-year term of supervised release, and the

mandatory assessment. Camacho now appeals.

### DISCUSSION

■ Camacho's principal claim focuses on the district court's refusal to order a reweighing of the drugs. He argues that the correct weight presented a disputed factual matter.

Resolution of disputed factual matters at sentencing is governed by rule 32 of the Federal Rules of Criminal Procedure and Chapter Six of the sentencing guidelines. Under Fed.R.Crim.P. 32(c)(3)(D),

> [i]f the comments of the defendant and the defendant's counsel or testimony or other information introduced by them allege any factual inaccuracy in the presentence investigation report or the summary of the report or part thereof, the court shall, as to each matter controverted, make (i) a finding as to the allegation, or (ii) a determination that no such finding is necessary because the matter controverted will not be taken into account in sentencing. A written record of such findings and determinations shall be appended to and accompany any copy of the presentence investigation report thereafter made available to the Bureau of Prisons.

This requirement not only protects the defendant's right to due process; it also helps clarify the record on appeal. *United States v. Gerante*, 891 F.2d 364, 367 (1st Cir.1989); *United States v. Ursillo*, 786 F.2d 66, 71 (2d Cir.1986).

To further ensure accurate fact-finding at sentencing, section 6A1.3 of the guidelines provides that "[w]hen any factor important to the sentencing determination is reasonably in dispute, the parties shall be given an adequate opportunity to present information to the court regarding that factor." U.S.S.G. § 6A1.3(a). The commentary to this section explains why greater procedural formality is necessary under the guidelines, but emphasizes that courts have the flexibility to tailor appropriate fact-finding procedures to the needs of each case:

> The court's resolution of disputed sentencing factors will usually have a measurable effect on the applicable punishment. More formality is therefore unavoidable if the sentencing process is to be accurate and fair. Although lengthy sentencing hearings should seldom be necessary, disputes about sentencing factors must be resolved with care. When a *reasonable dispute* exists about any factor important to the sentencing determination, the court must ensure that the parties have an adequate opportunity to present relevant information. Written statements of counsel or affidavits of witnesses may be adequate under many circumstances. An evidentiary hearing may sometimes be the only reliable way to resolve disputed issues. *See United States v. Fatico*, 603 F.2d 1053, 1057 n. 9 (2d Cir.1979). The sentencing court must determine the appropriate procedure in light of the nature of the dispute, its relevance to the sentencing determination, and applicable case law.

U.S.S.G. § 6A1.3, comment. (emphasis added); *see also United States v. Palta*, 880 F.2d 636, 640–41 (2d Cir.1989) (discussing obligations imposed by § 6A1.3).

Further inquiry of the type described in rule 32 and the guidelines is required, however, only when defendant raises a "reasonable dispute" about a fact material to the sentence. When nothing is presented to raise such a "reasonable dispute" over the weight of the drugs, a district court does not abuse its discretion by refusing to order a reweighing. Camacho argued that the police chemist could have rounded the weight of the drugs "up * * * to the nearest tenth [of a grain]". Even assuming that such rounding upward did occur, and that both batches of the drugs were of the least possible weight corresponding to the figures reported by the chemist, Camacho's offense level still would not have been affected. According to the chemist's report, the first batch weighed 1.4 grains while the second weighed 2.6 grains. If these batches actually weighed 1.35 grains (87.48 milligrams) and 2.55 grains (165.24 milligrams) respectively (the lowest possible weights that upon rounding upward to the nearest

tenth would have produced the weights reported), the resulting total in milligrams would have been 252.72, which would still have placed Camacho at offense level 14 rather than 12. As the district judge concisely put it, "[s]o take the worst script, you still end up with over the 250 [milligrams]."

There being no clear error of fact nor error of law underlying the district judge's refusal to order a hearing, the issue properly lay in his discretion. True, the indicated quantity was barely over the break-point between level 12 and level 14; but the fact remains that it *was* over that line. Simply being close to the line did not create a "reasonable dispute", and it certainly did not automatically require a reweighing of the drugs. We would expect that many judges, when faced with measurements as close as this one to the dividing line between two offense levels, would out of caution be inclined to pursue a further inquiry in order to ensure the greatest possible accuracy; surely it would be within the judge's power to do so. Nevertheless, we cannot say that it was an abuse of discretion for the district judge here to rely on the police lab report and the reasonable, indeed required, mathematical inferences to be drawn from it.

Camacho also urges us to reverse his underlying conviction and to order a new trial. He maintains that the district court improperly admitted certain evidence, including the record of his prior drug arrest and a statement of his co-defendant that Camacho and two others sold "good crack." These arguments are without merit.

■ Examination of the trial transcript makes it clear that the record, showing that Camacho had on another occasion been arrested for possession of drugs and disorderly conduct, was properly admitted into evidence. Camacho testified on direct examination that he had never been accused of "selling" drugs. On cross-examination, the government asked Camacho if he had ever "been involved in" or "possessed" drugs, to which he replied that he had not. After alerting the court and counsel at a sidebar conference, the government showed Camacho the arrest record and asked him if it refreshed his recollection. When Camacho continued to deny involvement with drugs, the government, as promised at sidebar, properly dropped this line of inquiry without attempting to offer the arrest record into evidence.

It was only after Camacho reopened the issue on redirect-examination and created the false impression that the arrest had *not* involved drugs that the court allowed admission of the arrest record. Thus the record was admitted not to impeach Camacho's general credibility through extrinsic evidence, *see* Fed.R.Evid. 608(b), but to contradict a false statement made by Camacho in his redirect testimony. Admission for this purpose is proper, because "[w]here a defendant in his direct testimony falsely states a specific fact, 'the prosecution will not be prevented from proving, either through cross-examination or by calling its own witnesses, that he lied *as to that fact.*'" *United States v. Cuadrado*, 413 F.2d 633, 635 (2d Cir.1969) (quoting *United States v. Beno*, 324 F.2d 582, 588 (2d Cir. 1963)) (emphasis in original), *cert. denied*, 397 U.S. 980, 90 S.Ct. 1107, 25 L.Ed.2d 391 (1970); *United States v. Bufalino*, 683 F.2d 639, 647 (2d Cir.1982) (where defendant testified on direct examination that his acquaintance with mob figure was based on "chance meetings", proper for government to introduce evidence showing defendant's longstanding relationship with La Cosa Nostra), *cert. denied*, 459 U.S. 1104, 103 S.Ct. 727, 74 L.Ed.2d 952 (1983); *United States v. Babbitt*, 683 F.2d 21, 25 (1st Cir.1982) (proper to admit evidence of two remote arrests to contradict defendant's direct testimony that he did not have police record); *see also Walder v. United States*, 347 U.S. 62, 65, 74 S.Ct. 354, 98 L.Ed. 503 (1954) ("there is hardly justification for letting the defendant affirmatively resort to perjurious testimony in reliance on the Government's disability to challenge his credibility"); 3 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 608[05] (1988) (discussing impeachment by contradiction). And once the arrest record was properly in evidence, there was nothing improper in

the government's limited reference to it during summation.

 The statement complained of, made by Camacho's codefendant, who was a "steerer" in the sale to the undercover agent—"I know these guys over here, they sell good crack"—was offered not to prove the truth of the matter asserted, but to help the jury understand the context of the transaction. Being both nonhearsay and relevant, the statement was properly admitted. *See, e.g., United States v. Rios,* 856 F.2d 493, 497 (2d Cir.1988).

Affirmed.