UNITED STATES of America
v.
Lawrence KEARNEY, Appellant.
No. 22411.

United States Court of Appeals
District of Columbia Circuit.

Argued April 29, 1969.

Decided Aug. 15, 1969.

Petition for Rehearing Denied
Sept. 11, 1969.

Mr. Joseph Forer, Washington, D. C., with whom Mr. M. Michael Cramer, Washington, D. C. (both appointed by this court), was on the brief, for appellant.

Mr. Roger E. Zuckerman, Asst. U. S. Atty., with whom Messrs. David G. Bress, U. S. Atty. at the time the brief was filed, Frank Q. Nebeker, Asst. U. S. Atty. at the time the brief was filed, and Victor W. Caputy, Asst.

U. S. Atty., were on the brief, for appellee.

Before BAZELON, Chief Judge, FAHY, Senior Circuit Judge, and LEVENTHAL, Circuit Judge.

LEVENTHAL, Circuit Judge:

Appellant, indicted for first-degree murder and convicted of second-degree murder, protests numerous rulings. We have pondered this appeal carefully and conclude that the trial judge accorded a fair trial.

I. *Trial Testimony*—The facts as developed by Government witnesses established the following: At 10:30 p. m. of Thanksgiving Day, November 23, 1967, Officer Silvia of the District Police force was cruising in the vicinity of 16th and Corcoran Streets, Northwest. He noticed a man tinkering with a parked car. Holding a flashlight on his badge, he approached the parked vehicle and identified himself to the man behind the wheel. The man moved across the seat and out of the car, reached into his coat, pulled out a pistol and shot Silvia in the abdomen. Sometime later Silvia was found and taken to the hospital in critical condition. An emergency operation was to no avail and Silvia died on November 25, during a second operation.

The Government's main witness was Stanley Warren, an eyewitness to the shooting. Warren's narrative was corroborated, by Detective Crooke's hearsay testimony, admitted over objection, of the account of events which Silvia had given to Crooke in an interview at the hospital around 10:30 a. m., the morning following the shooting. Silvia was then in the intensive care unit, having recovered about an hour earlier from the an-

aesthetic administered in the first operation. (That operation began at 11:50 p. m.—within an hour after the shooting —and lasted until 3:30 a. m.) Other evidence connecting appellant to the crime was the expert testimony that identified palm prints, lifted from the car at the murder scene, as those of appellant.

Ballistics evidence was also introduced tending to show that appellant could, at least, have had access to the kind of gun that fired the fatal bullet. This evidence consisted of a live cartridge of .38 caliber removed from appellant's drawer at his home and a spent .38 slug removed from the front door of appellant's apartment. A witness, William Isler, also testified that appellant had offered to sell him a .38 caliber pistol and that appellant had demonstrated the gun by firing it into a log in Isler's backyard. The slug was .38 caliber. The expert testimony was that the bullets recovered from appellant's dwelling and the log were too mutilated to permit any definitive conclusion as to whether they came from the same weapon that killed Silvia. The only firm conclusion was that all the bullets could have come from the same weapon.

In addition to this evidence the Government presented proof of appellant's blood type showing that it was of the same category as some blood removed from the driver's side of the car.[1]

Appellant testified that at the time of the shooting he was at a party in his own home that he was giving for his wife. Several of his friends related a similar story. He also called a fourteen year old boy who claimed to have witnessed the shooting from a block

---

1. Counsel submits that the admission of this testimony was error because it was marginally probative. Appellant's Type A blood appears to be typical of about 35% of the American Negro population. While he might have ruled differently, we do not think that the trial judge exceeded his discretion when he admitted the testimony into evidence. It was not so irrelevant as to have no probative value in the context of the other evidence that tended to place appellant at the murder scene. Defense counsel had an opportunity to rebut when a police surgeon was called to testify that his examination of appellant when arrested revealed no lacerations, and that a cut like the one that produced the blood found on the car would in all likelihood have shown up during such examination.

away, and who identified the killer as a man taller than appellant. On cross-examination the witness admitted that his opportunity to observe was limited.

II. *Affirmance of Ruling Deferring Impeachment of Witness Through Showing of Narcotics Use*—We turn to the claim that there was error in the judge's limitation of the effort of defense counsel to cross-examine Warren on his use of narcotics.

Defense trial counsel commendably raised the question before the judge out of the hearing of the jury, stating that he intended to ask questions on cross-examination that he anticipated might be objected to by the prosecutor, and that he desired an advance ruling to avoid a possibility of undue prejudice of the jury. Counsel said he would like to ask Warren whether he is a narcotics user and whether he was on narcotics when he gave a statement to the police. The prosecutor objected that these are improper questions unless defense counsel had a basis for them.

The transcript continues:

Defense counsel: And I think, therefore, it has some degree of relevance. We have information that he is a narcotics user.

Prosecutor: Oh, no. Unless you want to put on evidence on that, I object. You have got to have a basis for it.

The Court: Bring that out with a police officer.

Prosecutor: As to narcotics use. You have to have a basis for it.

The Court: Then this boy can come back on rebuttal.

Defense counsel: Will the police officer be here, the one who took the statement?

Prosecutor: I don't remember. You got a copy. I don't remember who the police officer is.

Defense counsel: Do you want me to bring the copy up your Honor?

The Court: No. * * * I don't want it from any kind of statement. I want it from the person who took the statement. * * * I want you to ask Crooke [it having been shown that Crooke took the statement from Warren].

Prosecutor: Unless he knows what Crooke is going to say. If he doesn't know that Crooke is going to say it, if Crooke denies it, then it is improper, it is an improper question.

Here defense counsel went on to a different point.

Defendant's appellate counsel argues that the cross-examination was plainly proper on the ground that the habitual use of drugs is permissible to impeach credibility,[2] and that it also related to possible impairment of the witness's ability to observe. Counsel relies on Wilson v. United States, 232 U.S. 563, 34 S.Ct. 347, 58 L.Ed. 728 (1914),[3] which held it improper for a judge to limit cross-examination of an admitted drug user to ascertain the extent of use at trial time and to explore the effect on his testimonial power of recollection.

Apparently trial counsel did not take the matter up with Crooke. But the issue of Warren's drug use did surface at the trial when defendant testified, on cross-examination, that Warren testified against him because he was a "young dope fiend." On rebuttal summation the prosecutor argued to the jury that this was self-serving testimony without foundation other than defendant's testimony.

The problem takes a new turn on appeal with the assertion in the brief of defendant's appellate counsel that Crooke's written resume of his interview with Silvia, which had been given defense counsel under the Jencks Act, con-

**2.** The brief cites Chicago & N. W. Ry. v. McKenna, 74 F.2d 155, 158–159 (8th Cir. 1934); Lankford v. Tombari, 35 Wash. 2d 412, 213 P.2d 627, 632, 19 A.L.R.2d 462 (1950); People v. Lewis, 25 Ill.2d 396, 185 N.E.2d 168 (1962); People v. Crump, 5 Ill.2d 251, 125 N.E.2d 615, 52 A.L.R.2d 834 (1955).

**3.** Counsel relies also on Rheaume v. Patterson, 289 F.2d 611, 614 (2d Cir. 1961).

tains the statement that Silvia told Crooke that the second man at the scene (*i. e.* Warren) "might be a junkie because of something about his eyes that he could not describe." This was omitted by Crooke when he gave detailed testimony of the statements made to him by Silvia.

The presence of this item in the Government's file may have significance in view of the prosecutor's objection to defense cross-examination for lack of basis. On the other hand, defense counsel did not refer to the Silvia statement. This portion of the Silvia statement is not in the record before us, and the issue could not become dispositive unless it were.[4]

To dispose of this case, let us step back to gain perspective. Certainly defense counsel is entitled to broad latitude in examination of prosecution witnesses to impeach credibility. Alford v. United States, 282 U.S. 687, 51 S.Ct. 218, 75 L.Ed. 736 (1931). And in general it is undeniable that it may be proper to develop the matter of drug addiction in an effort to attack a witness's competency and capacity to observe, remember and recall.[5] On the issue wheth-

4. We do not, however, accept the suggestion of the Government that the appellant's brief be stricken insofar as it refers to items not of record.

The Government apparently supposes that Suggs v. United States, 129 U.S. App.D.C. 133, 391 F.2d 971 (Jan. 4, 1968), forbids any reference to matters not strictly within the record unless application has been made for leave of this court to present affidavits to the trial court that evidence on these matters is available and would support a claim for newly discovered evidence. Both *Suggs* and Johnson v. United States, U.S.App. D.C., (June 20, 1969), must be read as applicable to cases where what appellant is seeking is a new trial on the ground of newly discovered evidence.

The broad authority of a Federal appellate court to make disposition in the interest of justice (28 U.S.C. § 2106), which of course includes the power to remand to a court or agency for the taking of additional evidence, also includes the power to consider on the merits a submission by a party which clearly indicates that what is involved is not of record and that what is desired is a result in the interest of justice. Such a suggestion may be treated in accordance with its spirit, even though the party has not made the proper technical motion. See United States v. Shotwell Mfg. Co., 355 U.S. 233, 237 n. 8, 78 S.Ct. 245, 2 L.Ed.2d 234 (1957)—where the party was the Government represented by the Solicitor General.

Sometimes the appellate court may avoid complete remand and may retain jurisdiction while returning the record to the trial court for enlargement of facts and appropriate findings that may relate to the decision of issues of law. McLindon v. United States, 117 U.S.App.

D.C. 283, 329 F.2d 238 (1964); Sera-Leyva v. United States, 133 U.S.App. D.C. 125, 409 F.2d 160 (Feb. 18, 1969).

In the interest of justice, and to provide sound disposition of precedential questions of law, an appellate court may on occasion refer to factual items lodged by the parties, even though not strictly part of the record, at least where there is no significant factual issue and no purpose would be served by a remand. Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 420, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964), International Union of Electrical, Radio and Machine Workers v. NLRB, 135 U.S.App.D.C. 355, 418 F.2d 1191 at n. 13 (July 22, 1969).

The present case involves a Jencks Act statement, which was in a sense already under the aegis of the trial court, and may well not involve factual issues that require delay pending trial court consideration. And since appellate counsel has explicitly identified Crooke's Jencks Act statements as outside the record, there is no question of imposition on the court.

The issue before the court is whether to amplify the record in the interest of justice, with or without a remand. We think counsel's explicit reference in brief can fairly be treated as a motion that the case, or record, be remanded if the court concludes this is in the interest of justice. Cf. United States v. Shotwell Mfg. Co., 355 U.S. 233, 78 S.Ct. 245, 2 L.Ed.2d 234 (1957).

5. Wilson v. United States, 232 U.S. 563, 34 S.Ct. 347 (1914) III Wigmore, Evidence § 934 at 481 (McNaughten Rev. 1961); C. McCormick, Evidence § 45 at 98 (1954); American Law Institute, Model Code of Evidence, Rule 106 (1942).

er this is material to credibility in terms of veracity, the authorities are in disarray.[6]

■ We need not explore this point at length for the disposition in the trial court was intended not to preclude an exploration of the issue, but to defer cross-examination pending establishment of a foundation for the questions.[7] All rules as to admissibility of evidence are subject to supervening considerations that seek to avoid substantial danger of undue prejudice or jury confusion.[8] The issue of narcotics use is one that may properly be handled with some sensitivity lest it result in undue and unnecessary prejudice. There is an interest in avoiding undue evidentiary assault on prosecution witnesses. Davis v. United States, 133 U.S.App.D.C. 167, 409 F.2d 453 (Feb. 18, 1969). Prejudice may result if questions asked for the limited purpose of testing, say, opportunity to observe, are permitted to generate a hostility based on the general odium of narcotics use.

A judge may not fairly block all probing of an issue like narcotics use by the prosecution's sole eye witness to a murder. On the other hand, as defense trial counsel himself recognized, the matter of drug addiction, which involves social transgression and the possibility of illegal conduct, is properly approached with awareness of the potential for prejudice of the jury. In some cases the desirable procedure may lie in permitting defense counsel to establish his foundation by questioning the witness out of the hearing of the jury, as is common-

place in a hearing preceding a determination of a witness's competency.[9]

In the particular case before us, the trial judge proposed a different course that seemed feasible and fair because of the presumed availability of the foundation evidence through Detective Crooke, and defense trial counsel did not indicate otherwise.

■ We have determined not to remand for inquiry as to whether overreaching by the prosecutor may have been involved in the limitation of defense cross-examination. The subject relates to the issue of identity, and the possibility of mistaken identity is strongly negatived—if indeed it is not eliminated beyond reasonable doubt—by the scientific evidence, particularly the palm prints, and the credibility of Warren's testimony as buttressed by the account given by Officer Silvia to Detective Crooke. Such strength of the Government's case is highly material in determining whether the interest of justice may be served by affirmance rather than remand for refinement of trial procedure.[10]

III. *Admissibility of Reliable Testimony Under Exceptions to Hearsay Rule*—Appellant argues that the trial judge erred in permitting Detective Crooke to repeat to the jury the account given to Crooke by Officer Silvia during an interview at the hospital.

■ After a hearing out of the jury's presence the trial judge ruled the testimony admissible based on a finding of overall reliability. We think that the statement is in the penumbra of both the spontaneous utterance and dying dec-

---

6. *See* authorities cited in note 3, and extended discussion in Kelly v. Maryland Cas. Co., 45 F.2d 782 (W.D.Va.1929), aff'd Maryland Cas. Co. v. Kelly, 45 F.2d 788 (4th Cir. 1930); *see also* 60 Colum. L.Rev. 562 (1960).

7. We assume the judge's reference to Warren's availability on "rebuttal" includes recall for further cross-examination.

8. American Law Institute, Model Code of Evidence, Rule 303 (1942).

9. United States v. Tannuzzo, 174 F.2d 177, 181 (2d Cir.), cert. denied, 338 U.S. 815, 70 S.Ct. 38, 94 L.Ed. 493 (1949).

10. *See* Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (June 2, 1969); Cross v. United States, 122 U.S.App.D.C. 283, 353 F.2d 454 (1965); Walker v. United States, 135 U.S.App.D.C. 280, 418 F.2d 1116 (April 28, 1969).

laration exceptions to the hearsay rule, and was correctly received in evidence. The event was close enough in time to support the likelihood of accurate recollection, and to mitigate the possibility that truth was undercut by speculation or fabrication. The declarant was a police officer, the kind of person who is a trained observer. He was not focusing his account on a person whose identity was known to him, nor transmitting conclusions; he was supplying raw data for analysis by investigators who would be charged with solving the crime. The lack of motive to lie is underscored by the fact that he apprehended that his injury was serious, as appears from his whispered plea to Crooke to look after the Silvia family.

We need not here decide whether the statement properly qualified, in a technical sense, as either an excited utterance, as it was labeled by the trial judge, or a dying declaration.[11] We cannot say that the trial judge's finding, that the evidence is fundamentally reliable, is erroneous. Silvia's statement was made under circumstances that conform to the general policies underlying the exceptions to the hearsay rule.

IV. *Admissibility of Certain Seized Evidence*—We turn next to appellant's claim that the trial judge erroneously failed to suppress certain evidence allegedly seized in violation of the Fourth Amendment and Rule 41(b) of the Federal Rules of Criminal Procedure. After arresting appellant on the basis of the information obtained from the eyewitness Warren, the police sought and obtained a warrant to search appellant's apartment for a cap and coat and any other "instrumentalities" of the crime. During the search the police discovered in a drawer a live .38 caliber cartridge, and also a spent .38 slug lodged in the front door of the apartment.

---

11. Appellant contends that Silvia's situation does not meet stringent tests set forth by the Supreme Court in Shepard v. United States, 290 U.S. 96, 99–100, 54 S.Ct. 22, 78 L.Ed. 196 (1933), for a dying declaration exception ("the consciousness of a swift and certain doom"). We do not rely solely on this exception to the hearsay rule and consequently need not consider whether these facts qualify as a dying declaration under *Shepard*.

Appellant also contends that the statement does not satisfy the requirement for admission as a spontaneous or excited utterance, and points to the fact that the statement was made almost twelve hours after the stimulating event and that it was given in an interview in response to questions. However, what must be taken into account is not only the length of the intervening time period but also an assessment of the declarant's activities and attitudes in the meanwhile, whether, *e. g.*, there was occasion for deviation from the truth under the impetus of reflection. Here the events occurred about 11 p. m. Between 11:50 p. m. and 3:30 a. m. the next morning, Silvia was being operated on. He came out of the anaesthetic about 9:30 a. m., and the brief interview with Crooke took place at 10:30 a. m. The fact that the statement was made in response to questioning several hours after the precipitating event is not decisive. *See* Guthrie v. United States, 92 U.S.App.D.C. 361, 207 F.2d 19 (1953); Beausoliel v. United States, 71 U.S.App.D.C. 111, 107 F.2d 292 (1939).

Appellant argues that Lampe v. United States, 97 U.S.App.D.C. 160, 229 F.2d 43 (1956), does not support admissibility of a statement made 12 hours after events.

Professor McCormick is of the view that time is not of the essence in these matters and that what transpires between the time of the exciting event and the declaration are key factors. Thus, he notes:

\* \* \* when the statement follows the event, the length of the interval between the startling event and the declaration is often crucial. Whether this period affords opportunity for contrivance will be much affected by the declarant's physical condition during the interval, and shock, pain, unconsciousness and like stresses will tend to postpone that opportunity. McCormick, Evidence § 272 at 580–81 (1954).

Whether we would be prepared to extend *Lampe* and admit this statement solely as an excited utterance is a point we need not decide in view of the fact that Silvia's declaration partakes of a dying declaration as well.

■ This evidence added little or nothing to the Government's already substantial case. Other evidence at trial tended to prove that the appellant might have had access to or possession of a .38 caliber pistol. The bullets found in the apartment could not be matched with the slug removed from Silvia's body. Viewed in this context, the error was not prejudicial if there was error,[12] and in view of the overall strength of the Government's case, it was harmless beyond a reasonable doubt.

Affirmed.

FAHY, Senior Circuit Judge:

I concur in Parts I, II and IV of the court's opinion. As to Part III, I would hold Officer Silvia's statement to Detective Crooke admissible as a dying declaration.

---

12. The cap and coat were "instrumentalities" within the meaning of Rule 41 of the Federal Rules of Criminal Procedure, even prior to the 1968 legislation, *see* Fuller v. United States, 133 U.S.App. D.C. ——, 407 F.2d 1199 (1967).

We have no occasion to consider the impact of Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (June 23, 1969), on Government contentions that seizure of the cartridge and bullet without a warrant does not violate the Fourth Amendment as interpreted by Marron v. United States, 275 U.S. 192, 48 S.Ct. 74, 72 L.Ed. 231 (1927).