**UNITED STATES of America, Appellee,**

v.

**William CARTER, Appellant.**

No. 92–3286.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 27, 1995.

Decided Nov. 28, 1995.

Mary M. Petras, Washington, DC, argued the cause for appellant. Robert E. Morin was on the briefs.

Leslie A. Blackmon, Assistant United States Attorney, argued the cause for appellee. With her on the brief were Eric H. Holder, Jr., United States Attorney, John R. Fisher, Elizabeth Trosman, and Margaret A. Flaherty, Assistant United States Attorneys.

Before: EDWARDS, Chief Judge, WALD and RANDOLPH, Circuit Judges.

Opinion for the court filed by Circuit Judge RANDOLPH.

RANDOLPH, Circuit Judge:

On August 12, 1991, three Metropolitan Police officers stopped a car they believed to be stolen. Carter bolted from the car. Two officers pursued him on foot. The third stayed with two suspects still in the car. At Carter's trial, all three officers testified that, during the chase, they saw Carter throw something from the bridge that runs over the rail yard behind Union Station. After apprehending Carter, the officers searched the rail yard and found three plastic bags containing approximately 56 grams of cocaine base.

Carter was charged with possession with intent to distribute fifty grams or more of cocaine base. 21 U.S.C. §§ 841(a)(1) & 841(b)(1)(A)(iii). At trial, Carter and his counsel tried to establish that there were four men in the car that day—not three, as the police testified—and that while both Carter and the fourth man ran, the fourth man—and not Carter—threw the drugs from the bridge. Carter's counsel argued that the "Keystone Kops" police had concocted the story about Carter to hide the fact that they had let the real culprit—the fourth man—escape.

That theory suffered a serious blow when the government introduced, as part of its rebuttal case, a tape recording of police radio transmissions made in the minutes surrounding Carter's arrest. On the tape—recorded in the heat of the chase, before the police would have had time to fabricate any story—the officers indicated that there were three people in the car ("White vehicle is occupied three times."); that only one of them ran ("He's on foot, black shorts, white T-shirt."); and that the one who ran threw something from the bridge ("He is throwing something over the bridge."). In its closing argument, the government stressed the importance of the tape and invited the jury to listen to it again. After an hour of deliberations, the jury accepted that invitation. Less than a half hour later, it returned its verdict of guilty.

Carter appeals on the ground that the government impermissibly delayed giving him the tape until the morning of the second day of trial. The government acknowledges that the Jencks Act, 18 U.S.C. § 3500, required it to produce at least a portion of the tape before Carter's trial began.[1] Once a government witness has testified on direct examination—at trial or at a suppression hearing—the government, on motion of the defendant, must produce any statement in its possession made by the witness and relating to the subject matter of the witness's testimony. 18 U.S.C. § 3500(b); FED.R.CRIM.P. 12(i). The Jencks Act defines "statement" to include a contemporaneous, verbatim recording of the witness's oral statements. 18 U.S.C. § 3500(e)(2). Officer Elisa Brown testified at a suppression hearing the day before Carter's trial. The government, therefore, was obliged, at that time, to provide the defense with at least the portions of the tape containing her radio transmissions. The government had a duty to provide the rest of the tape at trial when the officers testified on direct examination. Yet despite having assured both the defense and the court that it would produce all Jencks Act material before trial, the government failed to supply any portion of the tape until the second day of the trial, after the officers had left the stand.

■ For reasons we will explain in a moment, we believe the question here is whether the trial judge committed error in admitting the tape in spite of these Jencks Act violations—or, to put the matter differently, whether the trial judge erred in not excluding the tape as a sanction for the violations.

---

1. Carter attempted to argue his appeal under Federal Rule of Criminal Procedure 16(a)(1)(C). But as Rule 16(a)(2) states, the Jencks Act—and not Rule 16—governs the discoverability of "statements made by government witnesses." FED.R.CRIM.P. 16(a)(2); *United States v. Tarantino,* 846 F.2d 1384, 1414 (D.C.Cir.), *cert. denied,* 488 U.S. 867, 109 S.Ct. 174, 102 L.Ed.2d 143 (1988). Thus, the government's tardiness in turning over the tape could not have been a Rule 16 violation, and the Rule 16 cases upon which Carter relies are inapposite.

The Jencks Act, passed in the wake of *Jencks v. United States,* 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957), enhances the defense's ability to impeach or discredit prosecution witnesses through cross-examination. *See Campbell v. United States,* 365 U.S. 85, 92, 81 S.Ct. 421, 425, 5 L.Ed.2d 428 (1961). Noncompliance with the Jencks Act may impede the defense in this respect. The potential prejudice is that, in the eyes of the jury, the government's witnesses might appear more credible than they otherwise would have appeared had the defense impeached them with their prior statements. *Palermo v. United States,* 360 U.S. 343, 350, 79 S.Ct. 1217, 1223–24, 3 L.Ed.2d 1287 (1959). In this light it is easy to see why the Jencks Act "does not contemplate automatic sanctions even when the material has been rendered completely unavailable through loss or destruction." *United States v. Lam Kwong–Wah,* 924 F.2d 298, 310 (D.C.Cir. 1991) (quoting *United States v. Rippy,* 606 F.2d 1150, 1154 (D.C.Cir.1979)). If the unproduced statement could not have assisted the defense in cross-examining the witness, there is no reason for the trial court to order a mistrial or for an appellate court to reverse a conviction. When, for instance, the missing Jencks material duplicates what the defense already has in its possession, "it would deny reason to entertain the belief that defendant could have been prejudiced by not having the opportunity to inspect" that material. *Rosenberg v. United States,* 360 U.S. 367, 371, 79 S.Ct. 1231, 1234, 3 L.Ed.2d 1304 (1959). So too when the missing Jencks material duplicates the witness's testimony. *United States v. Lam Kwong–Wah,* 924 F.2d at 310.

*Lam Kwong–Wah* fits this case like a glove. The tape recording, far from impeaching the officers, supported them. On the stand, the officers said there were three people in the car, that only one of them ran, and that the one who ran threw something from the bridge. On the tape, the officers said there were three people in the car, that only one of them ran, and that the one who ran threw something from the bridge.

Carter thus cannot, and does not, claim that the government's delay in producing the tape recording prejudiced his efforts to discredit the officers through cross-examination. The harm he identifies is of a different sort. By the time the government produced the tape, Carter's counsel already had informed the jury—through his opening argument—of his fourth-man theory. If the government had complied with the Jencks Act, Carter says, he would have known that the government had a tape that put the lie to this theory. Armed with that knowledge, he may well have opened with a different defense theory. (This assumes that compliance with the Jencks Act at the pre-trial suppression hearing would have alerted Carter to the fact that the tape did not support his fourth-man theory.) We have no idea what that defense might have been; at oral argument, Carter's counsel was unable to say. Carter maintains that for these reasons the trial court erred in not excluding the tape recording.

We see things differently. Carter, it seems to us, wants to have his cake and eat it too. If the tape had never been received in evidence, Carter would have had no cause for complaint, as we have already mentioned. Yet Carter himself bears the responsibility for the tape's admission. The government produced it shortly before completing its case-in-chief. The prosecutor promised defense counsel that she would not use the tape in the government's case-in-chief. Presumably in view of this self-imposed restriction, Carter did not then ask for any sanctions. Nor did Carter ask for time to study the tape, despite the provision in the Jencks Act authorizing district courts to grant a recess for this purpose. 18 U.S.C. § 3500(c). Exactly when Carter's counsel learned of the tape's contents the record does not reveal.

After the government rested, Carter called Levi Horton, one of his companions in the car. Horton testified that Carter and another individual—the fourth man—ran from the car when the police arrived. After a break for lunch, Carter took the stand and testified contrary to what the tape revealed—that there was a fourth man and that he and this individual left the car running.

It was in view of this defense testimony, by Horton and Carter, that the tape recording became properly admissible in the

government's rebuttal case. Matters might have been very different if Carter had refrained from putting on that evidence. Then the tape recording would not have rebutted the defense case. Rebuttal evidence is admitted for the purpose of explaining or refuting evidence offered by the other side. *See, e.g., United States v. Tejada,* 956 F.2d 1256, 1266 (2d Cir.), *cert. denied,* 506 U.S. 841, 113 S.Ct. 124, 121 L.Ed.2d 80 (1992). To allow a defendant to present evidence supporting a version of events that, on appeal, the defendant all but admits is false, and at the same time to disable the government from revealing the truth to the jury, is a sanction that— if ever warranted—could be imposed only in the face of most egregious Jencks Act violations. This is plainly not the situation here. Carter's counsel told the court that he was

not even claiming bad faith on the part of the government. Even if the tape recording were otherwise inadmissible because of the delay in its production, Carter opened the door when he presented Horton and testified on his own behalf in contradiction to what the tape revealed. *See United States v. Garcia,* 900 F.2d 571, 575 (2d Cir.), *cert. denied,* 498 U.S. 862, 111 S.Ct. 169, 112 L.Ed.2d 133 (1990).

*Affirmed.*