Anthony D. WILLIAMS, Appellant,

v.

UNITED STATES, Appellee.

No. 00–CF–727.

District of Columbia Court of Appeals.

Argued May 23, 2001.

Decided Aug. 22, 2002.

Amy Wuliger Knee, appointed by the court, for appellant.

Christopher S. Rhee, Assistant United States Attorney, with whom Wilma A. Lewis, United States Attorney at the time the brief was filed, and John R. Fisher, Elizabeth Trosman, and Margaret A. Carroll, Assistant United States Attorneys, were on the brief, for appellee.

Before TERRY and FARRELL, Associate Judges, and BELSON, Senior Judge.

TERRY, Associate Judge:

Appellant was convicted of malicious destruction of property, second-degree burglary, and first-degree theft.[1] His principal contention on appeal is that the trial court improperly precluded his counsel from arguing to the jury that the government had failed to introduce evidence of blood at the scene of the crime. In addition, he argues that the court inappropriately restricted his counsel from fully cross-examining a government witness, and that the court erred in denying his motion for judgment of acquittal on the first-degree theft charge. We find no merit in these arguments, and thus we affirm the judgment of conviction.

## I

In late July 1998, Peter and Tina May were out of town on vacation. In their absence they had asked their next-door neighbor, Mark Johnson, to "keep an eye on their house." On Sunday, July 26, Mr. Johnson was in his back yard when he noticed that the Mays' back screen door was open. When he investigated further, he found that the screen door was torn, that the back door to the Mays' house was wide open, and that there was broken glass on the floor just inside the door. Believing that the Mays had been "robbed," Mr. Johnson asked his wife to call the police while he waited outside the Mays' house.

Police responding to Mrs. Johnson's call included Officer Billy Allen and a crime scene search officer. The officers discovered that the screen door had been opened by force and that there was some damage to the door frame. Officer Allen testified that a glass pane in the back door close to the doorknob had been broken, indicating that someone had broken the glass in order to open the door from the inside. An air conditioner had been removed from the window next to the back door. Upon entering the Mays' house, Officer Allen found the living room disheveled and several indications that electronic equipment was missing. In an upstairs bedroom, dresser drawers had been disturbed and emptied. There was also some damage to the area around a bedroom window, which led the officers to conclude that someone had at-

---

1. Appellant was also charged with receiving stolen property (RSP), but the court instructed the jury not to consider that charge if it found him guilty of theft of the same property because the two offenses were legally incon- sistent. Accordingly, having found appellant guilty of first-degree theft, the jury returned no verdict on the RSP count of the indict- ment.

tempted, without success, to remove an air conditioner from that window.

Later that day the Mays returned from their week-long vacation and learned of the burglary. They went through the house and noted that several of their possessions were missing, including a television set, three pieces of stereo equipment, an air conditioner, a microwave oven, a vacuum cleaner, some fans, an alarm clock, some of Mrs. May's jewelry, and a telephone with a built-in answering machine.[2]

The Mays had several conversations about the burglary with appellant, who lived across the street. The first such conversation took place while Mr. May was unloading his car. Appellant told Mr. May that if he and his wife "ever [found] out who did it, he would take care of them, or something like that." At that point Mr. May had not even discussed the burglary with appellant, and appellant did not reveal how he had learned about it.

That same afternoon Mr. and Mrs. May canvassed the neighborhood to ask if anyone had information about the burglary. When Mrs. May approached appellant on his front steps, he expressed concern about the burglary and offered to help. Mrs. May could not recall whether she had informed appellant of the burglary before he made these comments.

About an hour later, Mr. May had a second conversation with appellant. When appellant asked Mr. May whether he was missing any stereo equipment, "sort of an old fashioned kind with a silver face," Mr. May realized that this matched the description of his missing stereo. Appellant explained to Mr. May that he had been offered such a stereo by an unidentified man and had nearly bought it, but then changed his mind. Mr. May asked appel-

lant to let him know if he learned anything else about the burglary, adding that he was particularly concerned about his wife's missing jewelry, some of which had great sentimental value.

The following evening appellant went to the Mays' house to ask whether they were missing a microwave oven. When Mrs. May said that their microwave had been stolen, appellant returned within ten minutes carrying the Mays' microwave in a suitcase that had also been stolen. Appellant claimed that he had bought these items for fifteen dollars from a woman named Yolanda. Mrs. May believed that appellant expected payment for the returned items, but, suspecting that he might have been involved in the burglary, offered to compensate him at a later date, "once all this was sorted out."

A few more days passed before appellant again approached Mr. May. This time he said he had obtained some jewelry which, he thought, might have been stolen from Mrs. May. All of the items presented by appellant belonged to Mrs. May, although numerous other pieces of jewelry still remained missing. Once again, appellant claimed that he had bought the jewelry from Yolanda, who lived in a nearby apartment.

Appellant's uncle, Vernon Lawson, a long-time neighbor and friend to Mr. and Mrs. May, approached the Mays about a week after they returned from their vacation. He asked whether their stereo equipment had been stolen. When Mrs. May said that it had, he replied that appellant had recently sold him some stereo equipment and that he would bring it to the Mays' house. Later that day Mr.

---

**2.** While he was away, Mr. May had periodically checked his messages on this machine, most recently on the preceding Friday afternoon, July 24.

Lawson delivered to Mr. May his missing stereo receiver and cassette player.[3]

The government's final witness was Hazel Williams, appellant's mother. Mrs. Williams, who was living with her son at the time of the burglary, recalled seeing him carrying a stereo into the house. When she asked him where he had obtained it, he replied that it was a gift from a friend. However, after Mrs. Williams heard about the burglary, she confronted her son, and he confessed to her that he had stolen it. He told her that an accomplice had broken into the Mays' house and then passed him items from inside the house while he stood outside. When he saw the stereo equipment, however, he decided to retrieve it himself. Finally, Mrs. Williams said that appellant told her that he had sold the microwave to a woman, but that he was trying to retrieve it from her so that he could return it to Mrs. May.[4]

Appellant presented two witnesses, both of whom testified about injuries that appellant suffered on the morning of Saturday, July 25, the day before the burglary. Mrs. Williams stated that she sent her son to the hospital with cuts on his hand and leg. Dr. Keith Sanders, a trauma surgeon at District of Columbia General Hospital, testified that he treated appellant for lacerations to his hand and leg, which appellant said were stab wounds. The doctor acknowledged, however, that such lacerations could have been caused by broken glass. Dr. Sanders stated that appellant's injuries, whatever their cause, were "relatively superficial" and must have occurred

"shortly" before appellant came to the hospital.

## II

Appellant's principal contention on appeal is that the trial court improperly denied his counsel the right to argue to the jury that the government had failed to show, despite injuries suffered by appellant at around the same time as the burglary, that there was blood at the scene of the crime. This contention not only misperceives the court's ruling, but also fails to distinguish the facts of this case from those in *Greer v. United States*, 697 A.2d 1207 (D.C.1997), upon which appellant chiefly relies. We hold that *Greer* does not support appellant's argument, and hence we reject appellant's claim of error.

### A. *Factual Background*

During pre-trial discovery, the prosecutor sent a letter to defense counsel stating that the police had failed to take a sample of the blood found near the back door where the glass pane had been broken. In addition, a number of photographs from the crime scene had been lost. In light of these police errors, defense counsel filed a motion to dismiss the indictment as a sanction for the government's failure to preserve potentially exculpatory evidence. The trial court denied the motion because there had been no showing that the police had acted in bad faith in losing the evidence, citing *Arizona v. Youngblood*, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988).

Also during discovery, defense counsel learned that the police, upon arresting ap-

---

3. At trial Mr. Lawson testified that appellant had sold him the stereo equipment. When Mr. Lawson asked him how he had acquired it, appellant replied that it had been given to him by a friend.

4. Mrs. Williams was a very reluctant witness, frequently having to be reminded of her previous testimony under oath before the grand jury. She admitted that she did not want to testify against her son and that she was doing so only because she was under subpoena.

pellant, noted injuries to his hand and leg, which he claimed he had recently received as a victim of an attempted carjacking at a shopping mall. At a pre-trial hearing, the prosecutor informed the court, "We're not going to be seeking to introduce [appellant's] statements" about the cause of his injuries. Nevertheless, defense counsel renewed her earlier motion to sanction the government for its failure to preserve any blood evidence from the crime scene. Specifically, counsel asked the court to prohibit the government "from mentioning or making any reference at all to the blood on the scene or my client's injury."

The court acknowledged that it was "difficult for the government to establish that it was blood without some serology." Observing that "[i]t would be speculative and probably more prejudicial than probative ... for the jury to associate the injuries that Mr. Williams suffered at or about the time with the burglary," the court nevertheless agreed with the government that the failure to take a blood sample did not justify precluding the government from presenting any evidence about appellant's injuries, particularly since such evidence might provide some corroboration, albeit inconclusive, of the government's theory that appellant received those injuries during the burglary. The court therefore ruled that the government would be prohibited from introducing any evidence about the blood, but was free to offer other evidence of appellant's injuries.

Defense counsel persisted in her objection, asserting, "It's very detrimental to my client's case to have the government be able to make the suggestion that my client may have left blood at the scene and he was also injured." The court responded:

I'm not going to allow them to do it. You don't know if it was blood at the scene, animal blood, human blood. All they can say is that there was a break-in, glass was broken. They can say they questioned your client about his whereabouts, and he was injured. He says he was injured about the same time, but what else they're going to say about it is up to them. If they want to put in his full explanation, they can. If they don't want to do it and you want to, you can. It doesn't matter.

\* \* \* \* \* \*

... The only responsibility I have is to make sure it's fair.

Abiding by the court's ruling, the government made no reference to blood at the crime scene, or even to appellant's injuries, in either its opening statement or its case in chief.[5] Defense counsel, however, before cross-examining Mrs. Williams, informed the court that she wanted to ask Mrs. Williams about her son's injuries. The court suggested that such testimony should be introduced during the defense case, since it was "not really relevant within the scope of any direct examination right now." The court also questioned the wisdom of presenting such evidence[6] but did not prohibit counsel from offering it.

**5.** The only indirect reference to any possible injury was made by Mrs. May on cross-examination, after defense counsel asked her whether appellant "mentioned to you that he had been the victim of an attempted carjacking...." Before the government could object, Mrs. May replied, "Yes." In response to the government's objection that immediately followed, the court said, "Sustained, but it's too late." Neither counsel's question nor Mrs. May's answer, however, mentioned anything about injuries.

**6.** The court said to defense counsel, "I'm not sure why you want to do it, but that's completely up to you.... If you want to put it in your case, then the government will have a full opportunity to cross-examine him about the statements."

Accordingly, after the government rested, defense counsel put Mrs. Williams on the stand and asked her about her son's injuries, and she described them in some detail.

The following morning, before counsel called the next witness, the court again expressed doubt about the wisdom of raising the subject of appellant's injuries:

> I'm not sure what this is relevant to.... I precluded the government from putting on any evidence that there was any blood. All the jury knows is that a window was broken out. They don't have any reason to believe that the person who broke it out did so with an open hand, that he or she cut himself....
>
> If you put on evidence, obviously, that your client turned up with an injury at about the time of the offense, then the jury may just speculate, may not believe his explanation.

It was at this point that defense counsel suggested for the first time that appellant's injuries were "relevant to the theory of defense because the fact that he had an injury and that there was blood, certainly to the extent that there was no blood...." Counsel argued that, in accordance with *Greer*, she should be able to highlight to the jury that despite the cuts on appellant's leg and hand, the government had not presented any evidence of blood at the scene of the crime. Counsel elaborated that she thought

> that the decision the court made about the government not talking about blood on the scene was not [a] sanction imposed based on my motion in limine, but in fact was just a comment by the court that without any proof that [what] may or may not have been splattered on the scene was actually blood, that there's no

foundation for them to present evidence that there was blood on the scene.

The court explained, in response, that it had "a dual reason" for prohibiting the introduction of blood evidence: first, because the government had failed to preserve it by taking a sample of the blood found at the scene, and second, because it had determined that the potential prejudice to the defense from such evidence outweighed its probative value. The court went on, however, to admonish counsel that she should not "suggest [to the jury] that there is no evidence of blood...."

> I'm not going to let you argue to this jury something which is not true. I'm not going to let you, as an officer of the court ... get up and affirmatively tell this jury that there is no evidence of any blood being found on the scene. I'm not going to allow you to do that.

When counsel protested that she did not intend to argue "that there was no evidence of blood on the scene," but merely "that they haven't heard any evidence" about blood, the court replied, "I'm not going to let you argue that either." The prosecutor also "vigorously" objected, stating that the only reason that "evidence [of blood] didn't come out in trial [was] because we were precluded from [introducing] it."

The court ruled that defense counsel could not tell the jury that the government had failed to present evidence that there was blood at the crime scene. The court reasoned that the government had not introduced blood evidence, not because such evidence did not exist,[7] but because the government had been prohibited from introducing it:

> You know, the trial is obviously a battle, but it's also a truth-divining exercise.

---

7. Indeed, the government had other available evidence about the blood: potential testimony from several witnesses, including Mr. and Mrs. May, the crime scene search officer, and Officer Allen, all of whom had seen blood at the scene.

It's not an opportunity to sort of create untruths if we can possibly avoid doing that.

The sanction I imposed deprived the government of an opportunity to put on evidence, but I'm not going to allow you to step into the void and suggest that there is no such evidence available. It would have been available. The sanction I imposed is the appropriate sanction, which was to preclude them from access to evidence which would establish essentially your client's culpability. I'm not going to let you use it as a sword.

Following this ruling, the defense called its second and final witness, Dr. Sanders. Appellant did not testify.

Before closing arguments, the court reiterated that counsel could not highlight for the jury the "lack" of blood evidence at the scene of the crime. Addressing counsel's reliance on *Greer*, the court ruled that *Greer* was inapposite because the government's failure to present certain evidence in this case was due to a court order, rather than mere lack of evidence as in *Greer*:

> [The *Greer* case said] that things that the government had power to do but did not do [are a] legitimate [subject] for the defense to comment upon....
>
> Here ... I precluded the government from advancing certain arguments as a sanction.... I agree if the government could have done certain things and didn't do them, then you would have been entitled to argue [that] there's a lack of evidence.

But here, I precluded the government from making any such argument at all, and for the reasons I stated, I don't think it would be appropriate for you to make the argument you suggested. I still believe it would be wrong to do that.

### B. *Discussion*

■ Since the restriction on defense counsel's closing argument stemmed from the court's pre-trial ruling excluding the blood evidence, abuse of discretion is the appropriate standard of review. "[W]here defense counsel ... requests the imposition of specific sanctions for breach of the preservation rule, the decision as to what sanctions should be imposed or whether to impose any sanctions at all are matters committed to the trial court's discretion." *Sheffield v. United States*, 397 A.2d 963, 968 (D.C.), *cert. denied*, 441 U.S. 965, 99 S.Ct. 2414, 60 L.Ed.2d 1071 (1979); *see Davis v. United States*, 641 A.2d 484, 494 (D.C.1994), *cert. denied*, 514 U.S. 1028, 115 S.Ct. 1384, 131 L.Ed.2d 237 (1995).[8]

Appellant relies on *Greer* to argue that his counsel should have been permitted to "comment in closing argument on the failure of the government to present corroborative physical evidence," namely, the presence of blood at the scene of the crime. 697 A.2d at 1210. In *Greer* the defendant was charged with distributing cocaine. Throughout the trial, the defense theory of the case was mistaken identity. Defense counsel, in cross-examining the undercover officer, emphasized that the

---

8. Appellant incorrectly argues that the trial court's limitation on his closing argument is *per se* reversible error under *Thomas v. United States*, 473 A.2d 378 (D.C.1984). We disagree. In the case at bar, the court merely limited the scope of counsel's closing argument in light of the sanction it had previously imposed on the government at defense counsel's request. In *Thomas*, on the other hand, the trial judge—in a bench trial—flatly refused defense counsel's request to give a closing argument. Because the Supreme Court had held that the defense had "a right to be heard in summation of the evidence," we reversed the conviction and remanded the case for a new trial. *Id.* at 378 (citing *Herring v. New York*, 422 U.S. 853, 864, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975)). The facts are different, and *Thomas* is inapposite.

defendant had no drugs or pre-recorded money in his possession when he was arrested, nor was there any other evidence to corroborate the officer's testimony, such as fingerprints, photographs, videotape, or a recording of the officer's broadcast description of the drug seller. Despite efforts by defense counsel to show that such evidence was customary in drug cases, the court refused to allow counsel to argue its absence to the jury. Furthermore, the court instructed the jury that it "should base its decision . . . on the evidence which has been presented, and not on evidence that has not been presented." *Id.* We reversed, relying on such cases as *United States v. Hoffman*, 296 U.S.App. D.C. 21, 964 F.2d 21 (1992), and *United States v. Poindexter*, 942 F.2d 354 (6th Cir.), *cert. denied*, 502 U.S. 994, 112 S.Ct. 615, 116 L.Ed.2d 637 (1991), and held:

> [T]he jury may properly consider not only the evidence presented but also the lack of any evidence that the government, in the particular circumstances of the case, might reasonably be expected to present.

*Greer*, 697 A.2d at 1210.

■ The holding in *Greer* does not apply to the facts of this case. Because the government in *Greer* simply failed to present corroborating evidence, we concluded that defense counsel should have been allowed to point out this failure to the jury. In the case at bar, by contrast, the government had available evidence of blood at the crime scene [9] but had been prohibited from introducing such evidence by the trial court at the urging of defense counsel.

Appellant argues that the court's "preclusion [of blood evidence] was a result of the lack of evidence," not a sanction. But whether one characterizes the court's prohibition of blood evidence as an evidentiary ruling on prejudice versus probative value

or as a sanction for failing to preserve discoverable evidence (the court said it was both), the result was the same. The government was expressly prohibited from introducing any evidence about blood at the scene of the crime, even though such evidence existed. As the trial judge concluded, "[t]he sanction [he] imposed deprived the government of an opportunity to put on evidence," and hence he was "not going to allow [the defense] to step into the void and suggest that there is no such evidence available." This ruling was particularly appropriate, given that the order restricting the government from introducing evidence of blood was made *at defense counsel's request.*

The argument that defense counsel sought to make was contrary to fact, misleading, and inherently unfair. As we have said in a different but related context, counsel "should not be allowed to mislead the jury by trying to make something out of nothing." *Allen v. United States*, 603 A.2d 1219, 1223 (D.C.) (en banc), *cert. denied*, 505 U.S. 1227, 112 S.Ct. 3050, 120 L.Ed.2d 916 (1992); *cf. United States v. Carter*, 315 U.S.App. D.C. 45, 48, 70 F.3d 146, 149 (1995) (defense may not present evidence "supporting a version of events" that is plainly false, "and at the same time [seek] to disable the government from revealing the truth to the jury"); *see also Devonshire v. United States*, 691 A.2d 165, 169 (D.C.), *cert. denied*, 520 U.S. 1247, 117 S.Ct. 1859, 137 L.Ed.2d 1060 (1997) (defense may not object, on either Confrontation Clause or hearsay grounds, to the admission of out-of-court statements by an absent witness when defendant "was responsible for the witness's unavailability"). We hold that the order restricting defense counsel's closing argument was entirely proper.

**9.** See note 7, *supra.*

## III

### A. *Cross–Examination*

Appellant further contends that the trial court violated his rights under the Confrontation Clause of the Sixth Amendment by sustaining the government's objection to a question about Mrs. Williams' history of treatment for drug abuse.[10] He argues that evidence of his mother's drug abuse was "relevant both because it affect[ed] her ability to both perceive and recollect events, and because it establishe[d] an ulterior motive, to the extent that she received money for appearing before the grand jury and at trial that could have been used to purchase drugs." We find no ground for reversal.

The right to cross-examine a witness is a fundamental right under the Confrontation Clause. *See Chambers v. Mississippi,* 410 U.S. 284, 295, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). "Nevertheless, regulation of the extent and scope of cross-examination lies with the discretion of a trial judge." *Rogers v. United States,* 419 A.2d 977, 980 (D.C.1980). A trial court " 'may always limit cross-examination ... to prevent inquiry into matters having little relevance or probative value to the issues raised at trial' without committing error." *Id.* (citing *Springer v. United States,* 388 A.2d 846, 854–855 (D.C.1978)). In particular, we have held that "[g]iven the highly inflammatory nature of an allegation that a witness is a drug user, a trial court must exercise discretion concerning the proper scope of examination." *Rogers,* 419 A.2d at 981.

Despite the fact that defense counsel at trial offered no explanation of her reasons for asking Mrs. Williams whether she had been treated for substance abuse, appellant now makes two arguments to suggest the relevance of this question. First, he claims that his mother's prior drug abuse may have affected her ability to perceive and recollect events, and hence that it was a permissible subject of cross-examination under *United States v. Kearney,* 136 U.S.App. D.C. 328, 331, 420 F.2d 170, 173 (1969) ("it may be proper to develop the matter of drug addiction in an effort to attack a witness's competency and capacity to observe, remember, and recall"). Second, appellant argues that his mother's drug abuse gave her an ulterior motive for testifying, *i.e.,* that she was testifying in order to receive money to feed her drug habit.

Neither argument was made before the trial court. Appellant concedes that, under *Kearney,* defense counsel must either lay a foundation for the cross-examination or make a proffer outside the jury's presence before launching an "undue evidentiary assault on prosecution witnesses." *Id.* at 332, 420 F.2d at 174. Appellant asserts that his trial counsel was attempting to lay the required foundation when the court sustained the government's objection, but the record does not support this assertion. Defense counsel asked only one question (see note 10, *supra* ), which in the context of the case was both irrelevant and highly prejudicial. When the court sustained the government's objection, counsel made no attempt to explain the relevance or probative value of the question and its anticipated answer. As for the second argument, even if it had been raised, it would have been properly rejected. *See Barnes v. United States,* 614 A.2d 902, 904–905 (D.C. 1992) (refusing to allow police officer to be

---

10. The pertinent portion of the transcript reads as follows:

    Q. Mrs. Williams, have you ever ... received treatment for substance abuse?

    [PROSECUTOR]: Objection.

    THE WITNESS: No.

    THE COURT: Sustained. Sustained.

    [DEFENSE COUNSEL]: Okay. I don't have anything further for this witness.

cross-examined about whether he might be motivated to arrest innocent persons because he would receive overtime pay when testifying in court). On this record, we hold that the court did not abuse its discretion in sustaining the government's objection to defense counsel's question about drug abuse.

## B. *The Value of the Stolen Property*

Finally, appellant maintains that the court erred in denying his motion for judgment of acquittal on the charge of first-degree theft.[11] He contends that the government failed to establish that the fair market value of the stolen property was $250 or more, which is an element of that offense. *See* D.C.Code § 22–3212(a) (2001). We hold, however, that the government's evidence was more than sufficient to establish that the value of the stolen items surpassed $250.

In cases in which the value of stolen property is in issue, "the government must present evidence of an item's value at the time of the theft sufficient to eliminate the possibility of the jury's verdict being based on surmise or conjecture." *Malloy v. United States*, 483 A.2d 678, 680 (D.C.1984) (citations and internal quotation marks omitted). We have also held that "there are different methods of proving value, and no one method is preferred over others." *Zellers v. United States*, 682 A.2d 1118, 1120 (D.C.1996) (footnote omitted). In particular, "[t]he market value of a chattel . . . may be established by the testimony of its non-expert owner." *Saunders v. United States*, 317 A.2d 867, 868 (D.C.1974) (citation omitted).

In this case the government questioned the owners of the stolen property, Mr. and Mrs. May, at some length about its value and age. Mrs. May testified extensively as to the value and quantity of her stolen jewelry, which included thirty pairs of earrings and twenty rings (with an estimated cost of ten dollars each), a pearl jewelry set insured for $150, approximately ten bangles (worth approximately $150), and a few pins and other beaded bracelets (with an estimated value of at least $100). Unlike the electrical goods which Mr. May valued in his testimony,[12] Mrs. May's jewelry was not subject to "prompt depreciation or obsolescence." *See Zellers*, 682 A.2d at 1120 (holding that a camera and a .38 caliber pistol were items which typically would not depreciate quickly). We conclude that Mrs. May's valuation of her stolen jewelry was probably sufficient to support appellant's conviction of first-degree theft.

But we need not rely solely on Mrs. May's figures, because there was stronger evidence presented to the jury. Mr. May testified that he and his wife had been paid $1,755 by their insurance carrier, after a deductible of $250, as reimbursement for the stolen property under their home insurance policy.[13] Several courts have held that "an insurance loss payment is admissible to prove [the] market value of stolen

---

11. He makes the same claim with respect to the charge of receiving stolen property. However, since he was not convicted of receiving stolen property (see note 1, *supra* ), that claim is moot.

12. Mr. May testified as to the original cost and age of several electrical items stolen from the house. These included a twenty-year-old stereo, a two-year-old compact disc player, a ten-year-old cassette player, a microwave

oven, two fans, an air conditioner, a vacuum cleaner, an answering machine, and an alarm clock. While all of these items were operable and in good condition, many had depreciated in value over the years.

13. Mr. May also testified that he received a separate payment of $900 under the insurance policy to cover the damage to the back door.

goods." *United States v. Ricketson,* 498 F.2d 367, 373 (7th Cir.), *cert. denied,* 419 U.S. 965, 95 S.Ct. 227, 42 L.Ed.2d 180 (1974). In one case, for example, the Eighth Circuit, applying a federal criminal statute which requires that the market value of the stolen property be at least $5,000, held that evidence showing that insurance companies had paid out approximately $70,000 was "sufficient to send the question of market value to the jury." *United States v. Wigerman,* 549 F.2d 1192, 1193 (8th Cir.1977). This court also has held that the testimony of an owner that his car "was operable when stolen and that his insurance company reimbursed him $2800 for the loss of the car" was sufficient to sustain a first-degree theft conviction. *Phillips v. United States,* 778 A.2d 281, 284 (D.C.2001). Finally, a Florida appellate court has upheld a conviction of grand theft based on the victim's testimony "that he had to pay a $1,000 insurance deductible" before recovering on his insurance policy for the stolen goods. *Swain v. State,* 455 So.2d 533, 534 (Fla.Dist.Ct.App. 1984). The court reasoned that the victim

> had personal knowledge as to how much he paid on the insurance deductible, and we think that such testimony adequately proves that the value of the items stolen is worth at least the amount which [the victim] had to pay because of the theft.

*Id.* We agree, and apply this reasoning to the case at bar.

The deductible amount on the Mays' insurance policy was $250. This fact alone was sufficient (just barely) to justify the denial of appellant's motion for judgment of acquittal on the first-degree theft charge. When coupled with Mrs. May's

valuation of her stolen jewelry and the $1,755 that the Mays received from their insurer over and above the deductible amount, it was more than sufficient to enable a reasonable jury, without resorting to surmise or conjecture, to find that the value of the stolen property at the time of the theft equaled or exceeded $250.[14]

## IV

The judgment of conviction is *Affirmed.*

---

**14.** Our recent decision in *Hebron v. United States,* 804 A.2d 270 (D.C.2002), does not require us to hold otherwise. In *Hebron* we reversed a conviction of first-degree theft, remanding the case with directions to reduce the charge to second-degree theft, because there was no proof of either the condition of the stolen items (several pieces of furniture) or their rate of depreciation. There was no evidence in *Hebron* comparable to the insurance reimbursement of $1,755 in this case, or even the $250 deductible.