Marc **RAMIREZ**, Petitioner,

v.

**UNITED STATES of America,**
**Respondent.**

No. CV 97–2608(ADS).

United States District Court,
E.D. New York.

Nov. 5, 2001.

Memorandum Granting Rehearing
in Part Dec. 4, 2001.

Marc Ramirez, White Deer, PA, Petitioner Pro Se.

Kevin M. Schad, Schad, Buda, Cook L.L.C., Cincinnati, OH, Former Attorney for Petitioner.

Alan Vinegrad, United States Attorney, Eastern District of New York, Brooklyn, NY, by Jo Ann M. Navickas, Assistant United States Attorney.

### . MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

Petitioner Marc Ramirez (the "petitioner" or "Ramirez") commenced this *habeas corpus* proceeding pursuant to 28 U.S.C. § 2255. Specifically, the petitioner moves to vacate his conviction and sentence, or, in the alternative, "to order a new sentencing hearing based upon newly developed case law." Initially, the petitioner was repre-

sented by counsel, Kevin M. Schad, Esq. of Cincinnati, Ohio. However, some time in late 2000, Schad no longer represented the petitioner because of financial considerations. The petitioner is now proceeding *pro se*. A courtesy copy of this decision is being sent to petitioner's former counsel.

## I. BACKGROUND

Ramirez and many other defendants, nine of whom were on trial with him, were charged with being members of a major drug ring called the "Unknown Organization." This Organization operated a retail and wholesale narcotics business in certain areas in Brooklyn. The Unknown Organization was led by Ricardo Melendez, consisted of approximately 100 members and grossed over ten million dollars a month from heroin sales, together with additional revenue from cocaine sales. The Organization sold its narcotics in glassine envelopes stamped with particular brand names, such as "Unknown," "Critical," "Rated PG," and "No Mercy."

The Unknown Organization purchased large quantities of pure heroin which was cut by an expert called "Nelson the Cutter." The heroin distributed by the Unknown Organization was highly desirable to drug users because it was among the most potent available in the New York area, being about 50 to 60 percent pure. After the heroin was cut, it was transported to various "mills" where it was diluted and placed in glassine bags by dozens of sometimes nude and masked workers. The glassine bags were placed in commercial egg crates and then sent to assorted "retail establishments," known as "spots" in various Brooklyn locations. Extensive and detailed records were kept by the Unknown Organization with regard to each operation, with specific amounts, names of participants and expenses involved in each operation. The Unknown Organization enforced its operation, warded off competition and prevented stealing by its own members by intimidation, torture and murder.

In September 1989, an Eastern District Grand Jury returned a superceding indictment charging 39 defendants in a 43 count indictment. The charges included narcotics trafficking, racketeering, and murder, kidnaping and maiming in furtherance of racketeering activity occurring from January 1985 to October 16, 1989, as part of the Unknown Organization.

Ramirez was named in two counts, the narcotics conspiracy and one substantive count. Count Two charged conspiracy to distribute and possess with intent to distribute in excess of 1 kilogram of heroin and in excess of 5 kilograms of cocaine from January 1985 to October 16, 1989 in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A). Count Thirty charged Ramirez with the attempt to possess with intent to distribute in excess of 1 kilogram of heroin in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A). Both of these charges stemmed from a March 14, 1989 attempted heroin purchase in which the Government alleged that the petitioner was involved in a sting reverse buy in which a confidential informant named Phil Han was attempting to sell seven kilograms of heroin to Manuel Concepcion, a co-defendant and the head of the Unknown Organization, for the sum of approximately 1.1 million dollars, in which transaction Ramirez was heavily involved. The Government alleged that the petitioner, then 18 years old, and his friend "Jimmy" had arranged this heroin purchase.

On March 14, 1989, Manuel Concepcion, four co-conspirators and Ramirez were arrested while Concepcion was attempting to purchase approximately seven and one-half kilograms of heroin from Han, an informant. The arrest was preceded by a num-

ber of undercover meetings and telephone conversations, most of which were tape recorded. These conversations concerned negotiations between Ramirez and Han. During these conversations Ramirez vouched for Concepcion and co-conspirator Roberto Aponte. Ramirez told Aponte that he had access to more than seven kilograms of heroin. Aponte reported this to Concepcion who agreed to purchase the heroin. Ramirez was to receive between $90,000 and $100,000 for his role in this narcotics transaction.

In a short time Concepcion and others assembled more than one million dollars in cash. In subsequent conversations Ramirez pushed Han to hurry the deal to avoid keeping "his people" waiting.

Philip Han testified as follows:

Q The conversation you had with Ramirez after the 10:56 conversation, what did you and Mr. Ramirez talk about?

A I believe that's when he was asking me what is the delay, what is taking so long to do the deal.

*　　*　　*　　*　　*　　*

Q Did Ramirez ask you anything or did you tell him anything?

A Yes.

Q What?

A He asked me if I had enough room for the money.

Q Enough room where?

A He said, do you have enough room for the money. And I asked why.

Q What did he say?

A He said because the monies (sic) is in five boxes.

Q After the conversation, did you talk to Ramirez again?

A Yes, I did.

Q How much afterwards was the next conversation?

A I don't recall exactly.

Q Approximately?

A 20 minutes, 30 minutes, I'm not sure.

Q During that conversation, what did you say to Ramirez and what did he say to you?

A He was again asking me what the problem was, to hurry it up, and he said someone else wanted to talk to me.

Tr. 5595–96.*

On March 14, 1989, the parties met to complete the deal. Ramirez, Concepcion and Aponte transported four boxes and a bag full of money to Han's car, and Ramirez then went with Han to pick up what he thought were bricks of pure heroin. After taking possession of the supposed heroin, federal agents arrested Ramirez and the others. At the time of the arrests, the drug traffickers were in possession of approximately $1.1 million in cash and three weapons, including an Uzi .9 millimeter submachine gun. While in custody, Ramirez made statements to the police that he merely supplied the market. These statements were introduced at the trial.

The petitioner was tried with nine co-defendants beginning on August 27, 1990 before this Court. The petitioner was represented by Lynne F. Stewart, Esq. at trial and on appeal. At the four-month long trial, the Government presented voluminous testimony regarding the Unknown Organization's activities.

At the trial the petitioner testified and presented a defense of entrapment. He testified that this March 14, 1989 attempt to broker a heroin deal was his only con-

* Tr. refers to the trial transcript.

tact with dealing drugs. During his cross-examination, the Government brought DEA Agent Timothy Lum into the courtroom and before the jury. The Government then asked the petitioner if he had met this person, Agent Lum, in December 1989 to discuss brokering another heroin deal. The petitioner denied this assertion.

The trial counsel for Ramirez did not object to this demonstration at the time of the cross examination. However, after the petitioner concluded his testimony his counsel entered an objection on the record to the presentment of what she characterized as 404(b) evidence and the "parading" of Agent Lum before the jury. On rebuttal, the Government called Agent Lum as a witness. Agent Lum testified that while working undercover in December 1989, he had been introduced to the petitioner at a restaurant in order to set up a heroin sale. However, Agent Lum testified that no deal was ever consummated.

Also during trial, the AUSA Peter R. Ginsberg read into the record a redacted statement from co-defendant Roberto Aponte. The AUSA referred to this statement as "redacted" in cross-examining the petitioner, and in discussing this statement with other witnesses and the court. Although counsel for the petitioner asserts that during his summation, the AUSA inserted the petitioner's name into the redacted statement, the Court did not find this in the trial transcript.

On December 23, 1990, the jury returned a verdict of guilty on both counts against the petitioner.

A Pre–Sentence Investigation report (PSI) was prepared on June 25, 1991. The PSI recommended that the petitioner's offense level should be increased by four levels pursuant to § 3B1.1(a) because the petitioner organized the offense, recruited individuals, and directed their activities.

The petitioner was sentenced on September 13, 1991 by this Court. The petitioner's offense level was enhanced two levels for firearms used in the drug transaction pursuant to Guideline 2D1.1(b)(1). The guideline level was also enhanced four levels for his participation as an organizer in a multiple participant offense pursuant to Guideline 3B1.1(a). The Court also granted a two level reduction for acceptance of responsibility. Counsel for the petitioner made a motion for a downward departure based on her own conduct in "misleading Mr. Ramirez into going to trial on an entrapment defense" and based on her feeling that "some other lawyer might have said, maybe you should plead guilty," especially since he was only eighteen years old at the time of the offense. The grounds for the application for a downward departure apparently were that this conduct on counsel's part, and the age of the defendant, were not taken into consideration by the Guidelines or were "outside the heartland." The Court stated that it perceived no category for a downward departure based on the reasons stated by counsel, and the application was denied. In addition, the Court denied the Government's application for an upward departure.

The petitioner was sentenced to a term of 235 months, the lowest possible term under the guideline range, and to five years supervised release.

## II. *THE APPEAL*

Represented by his trial counsel, the petitioner filed an appeal to the Second Circuit. The petitioner raised the following issues:

1) His due process rights were violated by the Government's overall outrageous conduct.

2) The Government's use of other crimes evidence without prior notice violat-

ed his due process rights and was a continuation of prosecutorial misconduct.

3) The Government's failure to produce confidential informant "Jimmy" was a violation of due process and entitled Ramirez to a missing witness jury charge.

4) The trial court incorrectly increased Ramirez's offense level four levels based upon a clearly erroneous finding that he was an organizer or leader of a criminal activity that involved five or more participants.

On August 17, 1992, the petitioner's conviction and sentence was affirmed by summary order. *United States v. Maldonato, Ramirez, Bryce and Alvarez*, No. 91–1151(L), slip.op. (2d Cir.8/17/92).

## III. *PRIOR HABEAS CORPUS PROCEEDINGS*

In a decision dated March 10, 1998 this Court dismissed the petition on timeliness grounds. This decision was reversed by the Second Circuit which remanded the case for further consideration based on its decision in *Mickens v. United States*, 148 F.3d 145 (2d Cir.1998) (under the provision of the Anti–Terrorism and Effective Death Penalty Act of 1996, a petition filed within one year after the act's effective date of April 24, 1996, is not time-barred).

At the commencement of this *habeas* proceeding the petitioner was represented by Kevin Schad, Esq., a privately retained attorney. On March 2, 2000, the petitioner moved for the appointment of counsel and to be released on bail. He indicated that he could no longer afford to pay his counsel Kevin Schad and requested that Schad be appointed as his counsel and be paid by the Government pursuant to the Criminal Justice Act of 1964 18 U.S.C. § 30006a. In a decision dated September 27, 2000, the Court denied this motion. The Court held that the interests of justice did not necessitate appointing counsel for the petitioner:

The Court notes that the Petitioner, with the assistance of counsel, has already filed his petition and a reply to the Government's opposition. As the case is fully briefed and merely awaiting decision, there is no need to appoint counsel at this time. *Nunez v. U.S.*, 892 F.Supp. 528, 531–32 (S.D.N.Y.1995). Moreover, the Petitioner has failed to submit any evidence of the financial means available to him to pay for private counsel, and the extensive argument and citation in his *pro se* application for bail suggest that he is capable of presenting his claims effectively without the assistance of an attorney. *Harney v. U.S.*, 962 F.Supp. 322, 325 (N.D.N.Y.1997).

The petitioner also moved for his release on bail. In the same September 27, 2000 decision, the Court ruled that release on bail is reserved for "extraordinary cases involving special circumstances or a high probability of success." *United States v. Mett*, 41 F.3d 1281, 1282 (9th Cir.1994) and the situation in this case did not meet this difficult criteria. Further, in another decision by this Court dated March 10, 2001, the Court denied the petitioner's application for a certificate of appealability.

## IV. *THE PETITIONER'S CONTENTIONS IN THIS PROCEEDING*

The petitioner requests that his conviction and sentence be vacated, or that he be resentenced, based on the following grounds, including a litany of problems with his counsel at the trial and on appeal:

1) Petitioner was denied the effective assistance of counsel on appeal by her failure to raise the issue of the improper admission of Rule 404(b) evidence (the subsequent alleged December 1989 abort-

ed heroin deal) (a violation of his Sixth Amendment rights).

2) Petitioner was denied the effective assistance of counsel on appeal by her failing to raise "the sentencing court's misunderstanding its authority to depart" with regard to the petitioner's application for a downward departure (a violation of his Sixth Amendment rights).

3) Petitioner was deprived of his Sixth Amendment right to the effective assistance of counsel at trial in that "counsel failed to object to the government's use of a codefendant's redacted statement throughout trial and during closing which violated the Confrontation Clause and the Supreme Court's ruling in *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968.)"

4) The petitioner is entitled to be resentenced absent the erroneous organizer/leader four level enhancement, based upon newly developed case law.

5) Lastly, the petitioner submits that he has demonstrated that an evidentiary hearing should be held on the claims raised in this proceeding.

## V. *DISCUSSION*

### A. *Standards of Review*

As stated by the Second Circuit "[b]ecause requests for habeas corpus relief are in tension with society's strong interest in the finality of criminal convictions, the courts have established rules that make it more difficult for a defendant to upset a conviction by collateral, as opposed to direct, attack." *Ciak v. United States*, 59 F.3d 296, 301 (2d Cir.1995) (citing *United States v. Frady*, 456 U.S. 152, 165, 102 S.Ct. 1584, 1593, 71 L.Ed.2d 816 (1982)). ("[A]n error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment.") (internal quotation marks and citation omit-

ted). As a result, prisoners seeking habeas corpus relief pursuant to Section 2255 must show both a violation of their constitutional rights and "substantial prejudice" or a "fundamental miscarriage of justice." *Ciak*, 59 F.3d at 301.

Further, in Section 2255 proceedings, the Supreme Court has recognized the rule of "procedural default: [that prisoners] cannot assert claims they failed to raise at trial or on direct appeal unless they can show 'cause' for the default and 'prejudice' resulting from it." *Id.* at 302 (citing *Wainwright v. Sykes*, 433 U.S. 72, 87, 97 S.Ct. 2497, 2506–07, 53 L.Ed.2d 594 (1977)); *see also Reed v. Farley*, 512 U.S. 339, 114 S.Ct. 2291, 129 L.Ed.2d 277 (1994). The general rule is that a writ of habeas corpus is not a substitute for an appeal. "Where the petitioner—whether a state or federal prisoner—failed properly to raise his claims on direct review, the writ is available only if the petitioner establishes 'cause' for the waiver and shows 'actual prejudice from the alleged … violation.'" *Id.* at 354, 114 S.Ct. 2291 (citing *Wainwright*, 433 U.S. at 84, 97 S.Ct. 2497).

However, the traditional procedural default rule generally will not apply to ineffective assistance of counsel claims where a petitioner was represented by the same attorney at trial and on direct appeal and where such claims depend on matters outside the scope of the record of a direct appeal. *Billy–Eko v. United States*, 8 F.3d 111, 114 (2d Cir.1993). In *Billy–Eko*, the Court added that, "ineffective assistance of counsel claims are appropriately brought in Section 2255 petitions even if overlooked on direct appeal because resolution of such claims often requires consideration of matters outside the record on direct appeal …" *Id.* (citations omitted). Thus, ineffective assistance of counsel claims may be raised for the first time in a

habeas petition. *See United States v. Matos*, 905 F.2d 30, 32 (2d Cir.1990). Therefore, while the petitioner did not raise an ineffective assistance counsel claim on direct appeal, the Court is required to examine the merits of such a claim under Section 2255.

■ To establish an ineffective assistance of counsel claim, the petitioner must "show that counsel's representation fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 688, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984). Moreover, the petitioner must show that the "deficient performance prejudiced the defense." *Id.* at 687, 104 S.Ct. 2052. In order to show prejudice, the petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *United States v. Caputo*, 808 F.2d 963, 967 (2d Cir.1987) (quoting *United States v. Cruz*, 785 F.2d 399, 405 (2d Cir.1986)). The Court's determination, however, must be highly deferential to counsel as, "[i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or *adverse sentence.*" *Id.* at 689, 104 S.Ct. 2052 (emphasis added).

■ Finally, it is well settled that "(s)ection 2255 may not be employed to relitigate questions which were raised and considered on direct appeal." *Riascos-Prado v. United States*, 66 F.3d 30, 33, 34 (2d Cir.1995) (citing *Cabrera v. United States*, 972 F.2d 23, 25 (2d Cir.1992)). *See also Schlup v. Delo*, 513 U.S. 298, 318, 319, 115 S.Ct. 851, 862–63, 130 L.Ed.2d 808 (1995) ("[A] habeas court may not ordinarily reach the merits of successive claims ... absent a showing of cause and prejudice.") (citations and footnote omitted); *Douglas v. United States*, 13 F.3d 43, 46 ("[A]ny claim raised ... at this point that was also raised in [a] previous § 2255 mo-

tion [ ] or on direct appeal of [the petitioner's] conviction is precluded from consideration by this Court."); 28 U.S.C. § 2255 ("The sentencing court shall not be required to entertain a second or successive motion for similar relief on behalf of the same petitioner.")

### B. Alleged Ineffective Assistance of Counsel on Appeal—Failure to Raise the Improper Admission of Prejudicial Rule 404(b) Evidence

Stating that counsel on appeal has the duty to search for the strongest possible arguments and "must be zealous and must resolve all doubts and ambiguous legal questions in favor of his or her client," *McCoy v. Court of Appeals of Wisconsin*, 486 U.S. 429, 438, 108 S.Ct. 1895, 1902, 100 L.Ed.2d 440 (1988), the petitioner submits that he can demonstrate both prongs of the *Strickland* test. The petitioner contends that he was denied the effective assistance of counsel on appeal by counsel's failure to raise the subsequent uncharged criminal act involving the alleged abortive heroin deal in December 1989.

As stated above, the petitioner testified that the only heroin transaction he took part in was the one charged in the indictment. On cross-examination, the Government presented DEA Agent Lum. The following exchange occurred:

AUSA GINSBERG: Mr. Ramirez, does this refresh your recollection whether you negotiated a 15 pound heroin deal with a person by the name of Ah Cong?

RAMIREZ: No.

COURT: "This" meaning—is there a person you're referring to, Mr. Ginsberg?

AUSA GINSBERG: DEA Special Agent Timothy Wong (sic), [name mistranscription].

In rebuttal the Government produced Agent Lum who testified about the attempted drug transaction negotiation with Ramirez in December 1989. The petitioner contends that "Agent Lum's testimony regarding a subsequent bad act was inadmissible under the Rules of Evidence." While the petitioner's trial counsel objected to the admission of this testimony, she did not request a limiting instruction on the purpose of 404(b) evidence. According to the petitioner, this error was compounded by the Government's reference to the alleged subsequent bad act in closing arguments. Also, counsel did not raise the issue on appeal.

Further, according to the petitioner, "counsel's failure to raise this issue on appeal most probably would have resulted in a different outcome on appeal ... (and) there is a reasonable probability that but for the admission of this testimony the outcome of the proceeding would have been different." Therefore, the petitioner contends that his counsel's "ineffectiveness in failing to raise this erroneous admission of evidence fell below an objective standard of reasonableness which prejudiced the petitioner."

 The Government concedes that the petitioner's ineffective assistance claims do not require a showing of cause and prejudice, because Ramirez had the same counsel at trial and on appeal. *Billy–Eko v. United States,* 8 F.3d at 115. Also, the Court finds that, on appeal, the petitioner's counsel did not directly raise the 404(b) issue. Although counsel objected to the Government's introduction of this evidence on the ground of lack of notice, she did not argue the merits of this issue. Therefore, the issue is ripe for consideration in this habeas proceeding.

Initially, the Court notes that petitioner's trial counsel not only objected to this evidence, she sought a mistrial. Further,

the Court properly permitted the Government, during cross-examination, to bring Lum into the courtroom to stand before Ramirez. The petitioner took the stand in his own defense and testified to his alleged entrapment in the March 14, 1989 heroin deal. He also testified that the March 14, 1989 heroin deal was his only contact with drug dealing. On cross-examination he was questioned about this latter statement:

Q You still claim that this deal, the March 14th, 1989 deal, was the only heroin deal you've ever negotiated?

A Yes.

Q Mr. Ramirez, have you ever been to the BBQ Restaurant on Fifth Avenue?

A Plenty of times.

Q That's over at 10th Street and Fifth Avenue; is that right?

A 8th Street.

Q Do you recall on one of those occasions meeting a person who went by the name Ah Cong?

A I don't remember.

Q You don't remember that at all, Mr. Ramirez?

A I don't.

Q You're sure?

A Pretty sure.

Q Do you remember negotiating to buy 15 pounds of heroin with this person, Ah Cong?

A No.

Q It's your testimony—are you telling us you never met a person with the name Ah Cong?

A I don't remember ever meeting a person Ah Cong.

Q Are you telling us that you never negotiated a deal with a person named Ah Cong?

A No.

Tr. at 10102.

After this exchange, the prosecutor brought DEA Special Agent Timothy Lum into the courtroom. With Lum standing before the petitioner on the stand, the following occurred:

Q Mr. Ramirez, does this refresh your recollection whether you negotiated a 15 pound heroin deal with a person by the name of Ah Cong?

A No.

THE COURT: "This" meaning—is there a person you're referring to, Mr. Ginsberg?

MR. GINSBERG: DEA Special Agent Timothy Wong (sic)(Lum).

THE COURT: Who just walked into the courtroom.

Q Does this help you remember negotiating that heroin deal?

A I don't know him.

Q Never seen him before?

A Not that I can recall. I'm seeing a lot of agents in this building and DEA headquarters.

Q How about the BBQ Restaurant?

A A lot of people in BBQ all the time.

Q How about sitting down with this person on December 29, 1989, negotiating a heroin deal?

A I don't remember ever meeting him.

Q You don't remember negotiating a heroin deal either, do you?

A No, I don't.

Q *You're sure?*

A *Pretty sure.*

Q You remember after telling him that you were going to go through with the deal that one of your friends told you, in fact, he was a DEA agent; do you remember that?

A I don't understand what you mean.

Q Do you remember after telling this agent who had the name Ah Cong that you were going to go through with the deal that one of your friends told you he was a DEA agent?

A One of my friends told me he was a DEA agent?

Q Do you recall that?

A I never met him.

Q You don't recall calling him back, saying that you were afraid, you were not going to go through with the deal?

A No, I don't.

Q December, 1989?

A I don't remember that.

Q You're claiming March 14th was the only heroin deal you've ever negotiated?

A Yes.

MR. GINSBERG: Thank you, agent.

(Agent Wong (sic)(Lum) leaves courtroom.)

Tr. at 10103–04 (emphasis added).

Although this cross-examination was somewhat unusual and innovative, it was not improper. Eighteen-year-old Ramirez took the stand and, on direct, voluntarily testified that the March 14th deal was the only drug deal he had negotiated. He tried to give the impression that he was a young neophyte; he had never participated in drug deals previously; and he had been entrapped. In the Court's view, it was perfectly permissible on cross-examination, to show that he was lying and that he had attempted to negotiate another drug deal. The rule was stated in *United States v. Garcia,* 936 F.2d 648, 653–54 (2d Cir.1991):

Central to the proper operation of the adversary system is the notion that "when a defendant takes the stand, the [G]overnment be permitted proper and effective cross-examination in an attempt to elicit the truth." *United States*

v. *Havens,* 446 U.S. 620, 626–27, 100 S.Ct. 1912, 64 L.Ed.2d 559 (1980). Thus, where a defendant testified on direct examination regarding a specific fact, the prosecution may prove on cross-examination " 'that [the defendant] lied *as to that fact.'* " *United States v. Garcia,* 900 F.2d 571, 575 (2d Cir.) (citation omitted) (emphasis in original), *cert. denied,* 498 U.S. 862, 111 S.Ct. 169, 112 L.Ed.2d 133 (1990); *see also United States v. Bufalino,* 683 F.2d 639, 647 (2d Cir.1982) *cert. denied,* 459 U.S. 1104, 103 S.Ct. 727, 74 L.Ed.2d 952 (1983).

It is the basic purpose of cross examination to attempt to show that a witness had lied on the stand. True, the prosecution did it in a most dramatic fashion; but it was nonetheless permissible.

In *United States v. Beverly,* 5 F.3d 633 (2d Cir.1993), a similar factual scenario was presented. In *Beverly,* a drug conspiracy case, the Government elicited evidence as to the defendant's prior shooting and experience with guns on cross-examination and on rebuttal to impeach his testimony that he had no familiarity with guns. The defendant argued that the Government's impeachment evidence ran afoul of 404(b). The Second Circuit disagreed:

> White's invocation of rules 404(b) and 608(b) is misplaced. The government's questioning arose in the form of impeachment of specific falsehoods, not as an attack on his general character for truthfulness, Fed.R.Evid. 608(b), nor as an attempt to prove his bad character in order to show he acted in conformity therewith, Fed.R.Evid. 404(b).

> "Central to the proper operation of the adversary system is the notion that 'when a defendant takes the stand, the government be permitted proper and effective cross-examination in an attempt to elicit the truth.' " *United States v. Garcia,* 936 F.2d 648, 653 (2d Cir.1991)

(quoting *United States v. Havens,* 446 U.S. 620, 626–27, 100 S.Ct. 1912, 64 L.Ed.2d 559 (1980)). Once a defendant has put certain activity in issue by offering innocent explanations for or denying wrongdoing, the government is entitled to rebut by showing that the defendant has lied. *United States v. Mills,* 895 F.2d 897, 907 (2d Cir.), *cert. denied,* 495 U.S. 951, 110 S.Ct. 2216, 109 L.Ed.2d 541 (1990). Where a defendant testifies on direct about a specific fact, the prosecution is entitled to prove on cross-examination that he lied as to that fact. *Garcia,* 936 F.2d at 653. The same holds true for defendant's false statements on cross-examination. *United States v. Atherton,* 936 F.2d 728, 734 (2d Cir.1991). Finally, the government's opportunity to impeach the defendant's credibility once he has taken the stand includes the opportunity to use evidence that it was barred from using on its direct case. *Atherton,* 936 F.2d at 734.

\*　　\*　　\*　　\*　　\*　　\*

On cross-examination, the government questioned White regarding several prior incidents in which he allegedly possessed and used firearms. Through cross-examination and on rebuttal, the government introduced evidence White committed two shootings in Albany on March 28 and March 29, 1991.

\*　　\*　　\*　　\*　　\*　　\*

Prior to the commencement of trial the district court had ruled evidence of the shootings inadmissible on the government's direct case. Once White testified falsely, however, the district court allowed the government to use evidence of the prior shootings to impeach White's testimony because White had "got across to the jury he had nothing to do with any guns" and thereby "opened the door."

We agree, for the most part, that White opened the door to this impeachment by stating on direct that: (1) he never possessed any gun in Albany, (2) he had no familiarity with guns other than some unfinished training for a security job in the past.... Once White testified that he had no familiarity with guns other than some uncompleted training at a past job security guard, the government was entitled to impeach his testimony by establishing on cross-examination and rebuttal that, in fact, he was familiar with guns and had possessed and fired guns in Albany. *See Garcia,* 936 F.2d at 654; *United States v. Mills,* 895 F.2d 897, 907 (2d Cir.) *cert. denied,* 495 U.S. 951, 110 S.Ct. 2216, 109 L.Ed.2d 541 (1990); *United States v. Blake,* 941 F.2d 334, 338–39 (5th Cir.1991).

5 F.3d at 639–40.

■■■ Similarly, here, once Ramirez took the stand and testified on direct examination that the March 14, 1989 attempt to broker a heroin deal was his only contact with dealing drugs, the Government had the right to impeach his testimony on cross-examination and on rebuttal. As the Supreme Court stated, "It is essential ... to the proper functioning of the adversary system that when a defendant takes the stand, the government be permitted proper and effective cross-examination in an attempt to elicit the truth." *United States v. Havens,* 446 U.S. 620, 626–27, 100 S.Ct. 1912, 1916, 64 L.Ed.2d 559 (1980); *see also United States v. Payton,* 159 F.3d 49, 58 (2d Cir.1998). When a defendant offers an innocent explanation, he "opens the door" to questioning into the truth of his testimony, and the Government is entitled to attack his credibility on cross-examination. *United States v. Garcia,* 936 F.2d 648, 654 (2d Cir.1991) ("Once [defendant] Dominiguez testified that he had no idea that the white powder was cocaine, he opened the door for the Government to impeach his testimony by establishing on cross-examination that he was familiar with and indeed had used cocaine as recently as the day before his arrest.")

■■■ Thus, the admission of the December 1989 drug negotiation was not a 404(b) offer but was a permissible impeachment of the defendant as to an alleged falsehood in his testimony. The Government was entitled to confront Ramirez with this evidence on cross-examination and to adduce proof about the drug negotiation on rebuttal. That being so, it could not be ineffective assistance for counsel not to raise this issue on appeal. *See Caputo,* 808 F.2d at 967 (holding that in order to show prejudice a petitioner must demonstrate that but for counsel's alleged error, the result would have been different.) Accordingly, with regard to the "Lum testimony," and the alleged 404(b) issue, the petitioner's counsel representation did not fall below an objective standard of reasonableness, and there was no ineffective assistance either at trial or on appeal in this regard.

### C. Alleged Ineffective Assistance of Counsel on Appeal—Failure to Argue That the Sentencing Court Misunderstood its Authority to Downwardly Depart

The petitioner contends that counsel was ineffective on appeal for failing to argue that the District Court misunderstood its ability to downwardly depart at the time of his sentence. The petitioner argues that "this failure alone is sufficient to satisfy both prongs of the *Strickland* ineffective assistance of counsel test."

■■■ The Second Circuit has repeatedly stated that a sentencing court's failure to understand that it has the authority to depart downward is an appealable issue. See, e.g. *United States v. Montez–Gaviria,* 163 F.3d 697, 701 (2d Cir.1998). At the

sentencing, the petitioner's counsel moved in writing and orally at the sentencing proceeding for a downward departure. The Court denied the application. It is important that the Court set forth precisely what occurred at sentencing with regard to the petitioner's application for a downward departure.

THE COURT: Is there anything else in your communication, Miss Stewart?

MS. STEWART: No, Judge, we had asked finally for downward departure.

THE COURT: Departure?

MS. STEWART: *To some degree, I must admit this comes out of my own sense of remorse, may have been misleading Mr. Ramirez into going to trial on an entrapment defense.*

THE COURT: I am sure you didn't mislead anybody, Miss Stewart. You did not mislead him, but you gave it every shot that could be given. You were outstanding in this trial.

MS. STEWART: Thank you, Judge.

THE COURT: I don't know what you mislead. You mislead nobody. You gave him a defense that he could never complain about.

MS. STEWART: Judge, I guess my sense is that had it been otherwise, *perhaps some other lawyer might have said, maybe you should plead guilty. Maybe this isn't entrapment. Maybe this is enticement, not entrapment.* I do see the role of the government in this, to me, when the government goes into the business of selling drugs, things have turned topsy turvy. When they are selling drugs and enticing people into buying it is not entrapping them into buying it, it puts a different complex on a case. It's not the same as going out investigating, finding something going on and then using all their wires to make it happen again or make it happen in such a way that they can

bring it before a jury and prove it absolutely. *And for that reason I think that this is something that the Guidelines don't properly take into consideration.* I think that they don't address at all the situations where the government controls the amount of drugs to a certain degree by what they offer. If they offered a couple of ounces maybe Mr. Ramirez would only be before you for a couple of ounces, but by offering virtually unlimited amounts, they controlled the amounts that are the ultimate standard by which he is going to be sentenced. *I also don't think that we as a society really should think about putting eighteen year olds,* albeit he has passed the age of majority as a legal matter, but if we can think about our own—I don't want to repeat the summation. I know you sat valiantly through the summation—an eighteen year old wasn't even given the right to vote until a few years ago, and it just would seem to me that he is in a different posture because of his age, because of the excitement or the tintillation (sic-titillation) of making easy money, big money, being somebody, *it's different to an eighteen year old than it is to even a 21 year old or 25 year old, and I think even the Guideline age should not be a consideration, I think coupled with the fact of the government's involvement, it should be a consideration, and it's for those reasons together that I would ask that you depart downward.*

Sentencing Transcript pp. 20–22 (emphasis added).

In essence, the petitioner's counsel moved for a downward departure based on her feeling that some other lawyer might have recommended that Ramirez plead guilty; the Government's involvement in the seven-kilogram, $1.1 million drug deal; and his age of 18 years; all of which

reasons she claimed the Guidelines did not properly take into consideration.

In response the Government asserted that the law considers eighteen year olds to be the age of majority and responsibility; Ramirez "hit the streets with gusto in an attempt to put together a 1.1 million dollar deal"; he lied under oath at the trial; and "that lying is a proper basis for a two-point enhancement for obstruction of justice."

The Court denied the request for a downward departure stating that "Congress has enacted the Sentencing Guidelines with definite categories for downward departure. I see no category for a downward departure as a result of any of the things you said." The Court also denied the Government's request for an upward departure and the Government's other efforts to enhance the sentence. Also, despite the vigorous opposition of the Government, the Court granted to the defendant a two-point reduction for acceptance of responsibility.

In sum, the petitioner's contention is that, at sentencing and on appeal, the failure of counsel for the petitioner to raise the issue that the Court did not realize it had the authority to downwardly depart constitutes ineffective assistance of counsel. Petitioner argues that to adequately represent a defendant, counsel must be able to recognize how the Guidelines operate. The petitioner further asserts that if the sentencing judge knew that he had the authority to downwardly depart on the reasons raised by counsel, he would have granted the motion. This latter assertion constitutes the *Strickland* prejudice second prong. As a result, the petitioner contends that his sentence should be vacated and a new sentencing proceeding should be held, at which time the petitioner would be afforded his Sixth Amendment right to effective assistance of counsel.

In response, the Government argues that the Court's words at sentencing in regard to this application for a downward departure "do not suggest that it believed itself to be precluded from downwardly departing." The Court disagrees. While it did not expressly state that it had no authority to depart on the reasons raised by counsel, it stated that there "was no category for a downward departure." Those words were an indication by this Court that it believed that the Guidelines did not permit a downward departure under the circumstances presented to the Court. It is noted that this sentence was prior to the Supreme Court's seminal sentencing case in *Koon v. United States*, 518 U.S. 81, 98, 116 S.Ct. 2035, 2046, 135 L.Ed.2d 392 (1996), where it was stated emphatically that, "A district court's decision to depart from the guidelines ... will in most cases be due substantial deference, for it embodies the traditional exercise of discretion by a sentencing court."

■ However, having said that, this Court is of the view that even if counsel should have raised this point on appeal, it would have been to no avail. There is no authority for a sentencing court to downwardly depart based on a defendant's age of eighteen years. In fact, a defendant's youthful age is ordinarily not relevant in a downward departure application. Guideline § 5H1.1 provides as follows:

Age (including youth) is not ordinarily relevant in determining whether a sentence should be outside the applicable guidelines range. Age may be a reason to impose a sentence below the applicable guideline range when the defendant is elderly and infirm and where a form of punishment such as home confinement might be equally efficient as and less costly than incarceration. Physical condition, which may be related to age, is addressed at § 5H1.4 (Physical Condi-

tion, Including Drug or Alcohol Dependence or Abuse).

Also, a review of the authorities reveals that "youthful lack of guidance" is not recognized in the Second Circuit as a valid basis for downward departure. *United States v. Wong*, 40 F.3d 1347, 1381 (2d Cir.1994); *see also United States v. Haynes*, 985 F.2d 65, 68 (2d Cir.1993) ("We begin by noting that youthful lack of guidance has not been adopted as the law in this Circuit.")

█ Here, the sentencing court was asked to downwardly depart because of (1) counsel's remorse in not urging the defendant to plead guilty; (2) the renewed entrapment argument; and (3) his youthful age of eighteen years. To this Court's knowledge, there is no authority for a downward departure based on any of these grounds, nor based on a combination of these factors. Therefore, the Court properly stated that it had no authority to downwardly depart. Moreover, even if this issue had been raised on direct appeal and the Second Circuit had remanded the case for resentencing, the result would have been the same. This Court would not downwardly depart based on the reasons stated at sentencing.

Thus, the petitioner has failed to show that the "deficient performance," assuming that it was deficient, "prejudiced the defense." *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052. Accordingly, there was no ineffective assistance either at the sentencing or on appeal based on the downward departure sentencing issue.

**D.** *Alleged Ineffective Assistance of Counsel at Trial—Failure to Object to the Government's Use of a Co-defendant's Redacted Statement During Trial and Closing Arguments*

The petitioner contends that his counsel's failure to object to the introduction of a redacted statement by a co-defendant, Roberto Aponte, constituted ineffective assistance of counsel. In addition, the petitioner argues that this error was aggravated by the prosecutor's summation in which he referred to the redacted statement. This contention is patently without merit.

The Sixth Amendment guarantees a defendant's right to cross-examine witnesses. *Bruton v. United States*, 391 U.S. 123, 126, 88 S.Ct. 1620–21, 20 L.Ed.2d 476 (1968). In particular, *Bruton* held that in a joint trial, the confession of one co-defendant—which implicates both defendants—may not be introduced despite the court's limiting instruction that the confession be considered only against the confessing defendant. *Id.* at 128, 88 S.Ct. 1620. The *Bruton* rule was limited somewhat in *Richardson v. Marsh*, 481 U.S. 200, 211, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987), where the Supreme Court held that the Sixth Amendment is not violated where the non-testifying codefendant's confession is admitted with a limiting instruction, if the confession is redacted to eliminate both the defendant's name and any reference to his or her existence. *Id.*

█ In the succession of cases after *Bruton* the rule has been further refined. Today, the Court can admit a non-testifying co-defendant's confession if the statement is appropriately redacted to exclude any reference to the defendant and the statement does not clearly implicate the defendant. *Gray v. Maryland*, 523 U.S. 185, 189, 118 S.Ct. 1151, 1157, 140 L.Ed.2d 294 (1998); ("we concede that *Richardson* placed outside the scope of *Bruton's* Rule those statements that incriminate inferentially"); *see also United States v. Smith*, 198 F.3d 377, 385 (2d Cir.1999) ("In addition, the plea allocution was not incriminating on its face because it did not directly

implicate Smith. Therefore, we find no violation of Gray").

 Here, Aponte's statement was admitted over objection by other defense counsel. The statement was redacted to remove the names of the co-conspirators. A copy of the redacted statement is annexed to the opinion and designated as Appendix A. A review of the redacted Aponte statement reveals that the Court eliminated all references that could point to Ramirez. Not only were all names deleted but all specific locations were removed. The Court adheres to its statement made at the trial at the time of the statement's admission:

THE COURT: The statement doesn't point the finger at anybody. It's specifically within the exception to Bruton even as extended by Cruz. Does not say anything about anyone in this case. There are also sufficient number of defendants here and sufficient number of actors in this transaction that no one person is pointed out by this statement. That is under Richardson against Marsh.

Moreover, even if the statement had been erroneously received in evidence, in no way did this violation contribute to the guilty verdict. A confrontation clause violation is subject to a harmless error analysis. Any such error is harmless, when the Court is able to "declare a belief that it was harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 26, 87 S.Ct. 824, 829, 17 L.Ed.2d 705 (1967); *see also Harrington v. California*, 395 U.S. 250, 254, 89 S.Ct. 1726, 1728, 23 L.Ed.2d 284 (1969). Here, significantly, the defendant took the stand in his own defense and freely admitted his participation in the seven-kilogram heroin deal. His defense was entrapment, which the jury rejected. The Aponte statement had nothing to do with his convictions. There was no ineffective assistance of petitioner's counsel with regard to the redacted Aponte statement, as a matter of law.

### E. As to Newly Developed Case Law Requiring Resentencing Absent the Erroneous Leader Enhancement

The petitioner's sentence was enhanced four levels for being an organizer or leader of a criminal activity that involved five or more participants. Guideline § 3B1.1(a). He submits that he is entitled to be resentenced based on new case law, which demonstrates that his sentence was erroneously enhanced. The petitioner claims that he was "merely" a "broker" which is insufficient to hold him accountable as a leader or organizer under the newly developed case law.

In this regard, the petitioner cites to a number of Second Circuit cases speaking about "a chief organizer," the "highest ranking authority," and a "greater relative responsibility" being a leader/organizer. See *United States v. DeRiggi*, 72 F.3d 7 (2d Cir.1995); *United States v. Brinkworth*, 68 F.3d 633, 642 (2d Cir.1995); *United States v. McGregor*, 11 F.3d 1133, 1139 (2d Cir.1993). Also, the petitioner points out that the Eleventh Circuit found that a mere buyer/seller relationship does not establish the role enhancement. *United States v. Maxwell*, 34 F.3d 1006 (11th Cir.1994); *see also United States v. Atkinson*, 85 F.3d 376, 378 (8th Cir.1996). The petitioner contends that "the Petitioner at most was a broker," did not control Aponte or any other member of the Unknown Organization, nor did he set up the location of the transaction, and thus, "did not qualify as a leader or organizer under § 3B1.1."

In opposition, the Government states that Ramirez unsuccessfully raised this issue on appeal and is precluded from raising it here. In addition, the Government

contends that there is no change in the law in this regard, and, even if there was such a change, the petitioner could not prevail because of the rule in *Teague v. Lane,* 489 U.S. 288, 307, 310, 109 S.Ct. 1060, 1073–75, 103 L.Ed.2d 334 (1989).

At the sentencing the Court found, based on the evidence at the trial, that the Government established that Ramirez "was the initiating factor in this deal," and that he was most instrumental in putting this seven-kilogram, million dollar drug deal together in two days. Further, the Court found that Ramirez had "certain decision-making authority as to when and where and how ..." and that he recruited accomplices and "got all these people together." In addition, the Court found that the Government proved that "his degree of participation in planning or organizing the offense was a major one."

The petitioner raised this issue on appeal, and it was rejected. The petitioner's convictions were affirmed in a summary order on August 17, 1992. *United States v. Maldonato, Ramirez, Bryce and Alvarez,* No. 91–1151(L), slip. op. (2d Cir.8/17/92). While a summary order has no precedential effect, the Court is constrained to quote from the order in that it is part of the resolution of this contention in this habeas case. In particular, the Court of Appeals held:

> We are also unpersuaded by the contention that the district court erred in sentencing Ramirez as a leader of the conspiracy. "[F]indings as to the defendant's role[ ] need be established only a preponderance of the evidence and will be overturned only if they are clearly erroneous." *United States v. Jacobo,* 934 F.2d 411, 418 (2d Cir.1991). The record contained evidence that Ramirez, *inter alia,* initiated a million-dollar heroin transaction, was able to recruit several accomplices in less than a

day for the transaction, and was to receive $100,000 for his efforts, whereas another coconspirator was to receive only $10,000. In light of he record, the court's finding that Ramirez was a leader is not clearly erroneous.

■ Having raised this sentencing issue on appeal, the petitioner is precluded from again asserting it in a habeas proceeding. As stated in *Riascos–Prado v. United States,* 66 F.3d 30, 34 (2d Cir.1995):

> It is clear that " '[s]ection 2255 may not be employed to relitigate questions which were raised and considered on direct appeal.' " *Cabrera v. United States,* 972 F.2d 23, 25 (2d Cir.1992) (quoting *Barton v. United States,* 791 F.2d 265, 267 (2d Cir.1986) (per curiam)); ... *Douglas,* 13 F.3d at 46 ("[A]ny claim raised ... at this point that was also raised in [a] previous § 2255 motion[ ] or on direct appeal of [the petitioner's] conviction is precluded from consideration by this Court."); 28 U.S.C. § 2255 ("The sentencing court shall not be required to entertain a second or successive motion for similar relief on behalf of the same petitioner.").

■ Further, on the merits, the cases cited by counsel for the petitioner do not appear to be that kind of change in the law that would have affected the Court's initial sentencing determination. Moreover, this "new" case law could not serve as a basis for resentencing the petitioner. New rules generally should not be applied retroactively to a case on collateral review. In *Teague v. Lane,* 489 U.S. 288, 307, 109 S.Ct. 1061, 1073, 103 L.Ed.2d 334 (1989), it was decided that there were only two exceptions to the general rule of non-retroactivity for cases on collateral review. First if the new rule places "certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe." Second, a new rule

should be applied retroactively if it requires the observance of "those procedures that ... are 'implicit in the concept of ordered liberty.'" *Teague*, 489 U.S. at 307, 109 S.Ct. at 1073; see also *United States v. Salerno*, 964 F.2d 172, 176–77 (2d Cir.1992) applying the *Teague* Rule "to federal prisoners seeking relief pursuant to § 2255." In this case, the sentencing issue here and the "new" case law, do not fall within either prong of the *Teague* Rule and, thus, will not be applied retroactively.

In his reply brief, the petitioner cites to *Jones v. United States*, 161 F.3d 397, 403 (6th Cir.1998) in which the court retroactively applied a clarifying amendment to the Guidelines. The court held that "It is unfair to punish a defendant for the Commissioner's lack of clarity, especially when the Commissioner acknowledges and corrects the ambiguity." The petitioner's reliance on *Jones* is misplaced. Here we do not have a clarifying amendment, but an alleged difference of opinion in interpreting an existing unamended guideline. However, these "new" cases, even if considered by the Court, would not require resentencing.

For the reasons stated above, the petitioner's claim based on a subsequent change in the law, as to the organizer/leader sentencing issue, is denied.

### D. *As to the Petitioner's Request for an Evidentiary Hearing*

In his final contention, the petitioner asserts that, due to the nature of the claims he has raised, he is entitled to an evidentiary hearing on these matters. Ramirez argues that there are disputed issues of facts to be resolved or at least, "it is not clear from the record itself that the facts alleged in [his] habeas ... petition would not entitle the petitioner to relief." Also, the petitioner contends that an evidentiary hearing is required where his

claims, if taken as true, would entitled him to relief.

▮ Section 2255 requires the district court to hold a hearing "unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." In reviewing the law as to whether to hold a hearing in a habeas case, the Court finds that "a district court has broad discretion to hear further evidence in habeas cases." *Nieblas v. Smith*, 204 F.3d 29, 31 (2d Cir.1999). *See also Townsend v. Sain*, 372 U.S. 293, 318, 83 S.Ct. 745, 759, 9 L.Ed.2d 770 (1963) ("In every case [the district judge] has the power, constrained only by his sound discretion, to receive evidence bearing upon the applicant's constitutional claim."). The rule in this regard is stated in *Hayden v. United States*, 814 F.2d 888, 892 (2d Cir.1987):

A petition for habeas corpus requires a hearing to resolve disputed issues of fact unless the record shows that the petitioner is not entitled to relief. 28 U.S.C. § 2255. We have consistently held that the standard to be used in making this determination is whether, "if the evidence should be offered at a hearing, it would be admissible proof entitling the petitioner to relief. Mere generalities or hearsay statements will not normally entitle the applicant to a hearing, since such hearsay would be inadmissible at the hearing itself. The petitioner must set forth specific facts which he is in a position to establish by competent evidence." *Dalli v. United States*, 491 F.2d 758, 760–761 (2d Cir.1974) (citations omitted).

Recently, in *Chang v. United States*, 250 F.3d 79, 84–86 (2d Cir.2001), the judge who presided at the underlying trial, decided the habeas petition without an evidentiary hearing. In affirming, the *Chang* court relied on Section 2255 itself, which expressly provides that the "Court may

entertain and determine such motion without requiring the production of the prisoner at the hearing." 28 U.S.C. § 2255. *See Machibroda v. United States,* 368 U.S. 487, 495, n. 4, 82 S.Ct. 510, 7 L.Ed.2d 473 (1962). The Court cited with approval the decisions of the Fourth and Tenth Circuits which made it clear that the court has discretion to ascertain whether the claim is substantive before granting a full evidentiary hearing. Also, in *Chang,* the Court observed that "Judge Glasser, having tried the case, was intimately familiar with the trial proceedings and the events and circumstances surrounding them. It was within the Court's discretion to determine that more was not needed." *Id.* at 86.

 In this proceeding, the petitioner has set forth no specific facts which raised any material issues of fact requiring a hearing. The Court had before it a complete transcript of the trial and the sentencing proceeding. The petitioner's voluminous motion to vacate the sentencing with attached exhibits fully set forth all of the prior proceedings and the contested matters. The petitioner's memorandum of law reviewed all of the factual issues and capably set forth the legal precedents. In addition, the petitioner's reply memorandum carefully attempted to refute the Government's arguments. Most importantly, however, this Court presided at the four-month criminal trial, and "is intimately familiar with the trial proceedings and the events and circumstances surrounding them." In the exercise of the Court's discretion no evidentiary hearing is required.

### CONCLUSION

For the foregoing reasons, the petition is denied in all respects. Further, having considered the standards for a certificate of appealability under Fed. R.App. Pro. 22(b) and 28 U.S.C. § 2253(c)(2), as set forth in *Barefoot v. Estelle,* 463 U.S. 880, 893 n. 4 103 S.Ct. 3383, 3395, 77 L.Ed.2d 1090 (1983) and *Lucidore v. New York State Div. Of Parole,* 209 F.3d 107, 112 (2d Cir.2000), the Court finds that the petitioner fails to make a sufficient showing to entitle him to a certificate of appealability.

Accordingly, the petition is dismissed and the Clerk of the Court is directed to close this case.

**SO ORDERED.**

### SUPPLEMENTAL MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

On November 5, 2001, this Court issued a thirty-six page Memorandum of Decision and Order, which in all respects denied this Section 2255 habeas corpus petition.

On November 15, 2001, the Court received a letter dated November 10, 2001 from Marc Ramirez, the Pro Se Petitioner. In this letter the Petitioner asserts that the Court failed to address "the major issue raised in the lower court", the *Massiah* issue. Annexed to the Petitioner's letter is a Motion for Reconsideration.

The Motion for Reconsideration states that on July 2, 1997 "a supplemental memorandum was submitted to the District Court by Petitioner in which an additional allegation was added alleging a violation of the Petitioner's rights pursuant to *Massiah v. U.S.* and the Sixth Amendment of the Constitution." In his supplemental memorandum the petitioner asserted that "he was denied his right to counsel because the respondents used evidence obtained in violation of *Massiah* against Petitioner at his trial, and without such evidence Petitioner would not have been convicted."

The Motion for Reconsideration further states that the Government responded to the Petitioner's supplemental memoran-

dum on March 22, 1999 and the Petitioner filed a reply on April 26, 1999. Further, the Petitioner contends that the *Massiah* issue was properly joined and "constitutes the gravamen of petitioner's case." The Petitioner further asserts that "this Court, in the November 5, 2001 decision completely failed to address the issue." Petitioner is unable to adequately perfect his appeal until and unless the issue is determined.

The Petitioner is correct. The Court inadvertently overlooked the Petitioner's supplemental memorandum, and the response and reply. Therefore, the Court will grant the Petitioner's motion for reconsideration only to the extent that it will now decide his claim of ineffective assistance of counsel based on the *Massiah* issue.

The background of the case, the appeal from the convictions and the prior proceedings in this matter are set forth at length in the Court's November 5, 2001 decision and need not be repeated.

### THE MASSIAH CONTENTIONS

In his Supplemental Memorandum of Law, the Petitioner asserts that his counsel was ineffective at trial by failing to object to "the Government's violation of *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964) and the Sixth Amendment right to counsel". He relates that while he was out on bail in connection with the indictment in this case, an undercover government agent "deliberately elicited incriminating statements from the petitioner in the absence of counsel and then utilized these incriminating statements as evidence against him at his trial."

The charges in this case against the Petitioner emanate from a major drug transaction which took place on March 14, 1989. The Petitioner relates that on December 20, 1989, while he was out on bail

with regard to the charges in this case, DEA Agent Timothy Lum, acting in an undercover capacity, allegedly met him at the BBQ restaurant to discuss a heroin deal, which was not consummated. The Petitioner further correctly states that at the trial in this case, the Government presented DEA Agent Lum to testify about incriminating statements the Petitioner made in the absence of counsel regarding the December heroin transaction. The Petitioner alleges that this meeting was set up by the Government to circumvent his Sixth Amendment right to the presence of counsel. He further contends that he had pled not guilty to the charges at issue, retained counsel and made a motion setting forth his intention to utilize an entrapment defense at the trial. In addition, he contends that Agent Lum's supervisor, Agent Piccininni was also the supervising agent for the activities at issue during this trial. Also, he asserts that Agent Lum's FOI Report of the December 20, 1989 meeting utilized the Petitioner's original case number CI–89–0193.

In sum, the Petitioner contends that "the same case number and same supervising agent demonstrate that the government utilized this December 20, 1989 meeting to obtain evidence and incriminating statements of the Petitioner to utilize at the Petitioner's trial for which the indictment was pending in order to contradict the Petitioner's entrapment defense." Further, the Petitioner states:

> The Petitioner contends that it is clear that the incriminating statements which Agent Lum testified to were deliberately elicited from the Petitioner in the absence of counsel. Therefore, the Petitioner submits that the government's use as evidence of these incriminating statements deliberately elicited in the absence of counsel while supposedly investigating "new crimes" related to the

pending indictment violated his Sixth Amendment right and the Supreme Court's mandate of *Massiah* and progeny.

The Petitioner therefore concludes that his counsel should have objected at the trial, based on the *Massiah* Rule and the failure to do so "fell below an objective standard of reasonableness." Further, the Petitioner contends that his counsel's ineffectiveness in failing to object prejudiced him. He asserts that had counsel objected to the Government's use of this evidence, the objection would have been sustained and "the government would have been left without any evidence in which to refute the Petitioner's strong entrapment defense" and "there exists a reasonable probability that the result of the proceeding would have been different". Therefore, he reasons that "[t]his violation by the government and counsel's ineffectiveness demands that the Petitioner's conviction and sentence be vacated". In addition, the Petitioner contends that, at the least, "he has provided the proof necessary for an evidentiary hearing on this supplemental issue."

In opposition, the Government contends that the Sixth Amendment right to counsel is offense specific. In that regard, the Government contends that the Sixth Amendment does not prohibit the questioning of an individual regarding other crimes, "as to which the right has not yet attached". In sum, the Government asserts that Lum's meeting with the Petitioner on December 20, 1989 "had nothing to do with the pending charges against him". Moreover, the Government contends that even if the December 20, 1989 meeting did concern the charges at issue in this case, "nothing improper occurred since the Sixth Amendment does not prohibit the use of such statements for impeachment purposes ... or if another exception to the exclusionary rule applies".

## DISCUSSION

### I. *The Massiah Rule and the "New Crime" Exception*

In *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964) the Supreme Court held that a defendant's Fifth and Sixth Amendment rights were violated by the use in evidence of incriminating statements which he made to a co-defendant, after indictment and their release on bail, without the defendant's knowledge that his co-defendant was cooperating with the Government. The Supreme Court approved the rule followed in the New York Courts that, "Any secret interrogation of the defendant, from and after the finding of the indictment, without the protection afforded by the presence of counsel, contravenes the basic dictates of fairness in the conduct of criminal causes and the fundamental rights of persons charged with crime." *Id.* at 206, 84 S.Ct. 1199. The Court then stated the Rule now known as the *Massiah* Rule:

> "Here we deal not with a state court conviction, but with a federal case, where the specific guarantee of the Sixth Amendment directly applies.... We hold that the petitioner was denied the basic protections of that guarantee when there was used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel. It is true that in the Spano case the defendant was interrogated in a police station, while here the damaging testimony was elicited from the defendant without his knowledge while he was free on bail. But as Judge Hays pointed out in his dissent in the Court of Appeals, 'if such a rule is to have any efficacy it

must apply to indirect and surreptitious interrogations as well as those conducted in the jailhouse'. In this case, *Massiah* was more seriously imposed upon * * * because he did not even know that he was under interrogation by a government agent."

*Id.* at 206, 84 S.Ct. 1199.

However, the incriminating statements in *Massiah* made to the secret cooperating codefendant were related to the narcotics activity for which the defendant was convicted. Similarly, following *Massiah,* in *United States v. Henry,* 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980) in jail preceding trial, the defendant made incriminating statements to an informant inmate regarding the very bank robbery for which the defendant was indicted and incarcerated. *See also United States v. Rosa,* 11 F.3d 315, 329 (2d Cir.1993) (The incriminating statements concerned the charges at issue). Twenty years later the Supreme Court revisited the issue in *Maine v. Moulton,* 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985). Here again, the incriminating statements made to a cooperating co-defendant, without the presence of counsel, involved the very charges for which the defendant was under indictment and subsequently tried and convicted. Also, the issue of pending charges and "new crimes" was discussed in *Moulton:*

> On the other hand, to exclude evidence pertaining to charges as to which the Sixth Amendment right to counsel had not attached at the time the evidence was obtained, simply because other charges were pending at that time, would unnecessarily frustrate the public's interest in the investigation of criminal activities. *Consequently, incriminating statements pertaining to pending charges are inadmissible at the trial of those charges,* notwithstanding the fact

that the police were also investigating other crimes, if, in obtaining this evidence, the State violated the Sixth Amendment by knowingly circumventing the accused's right to the assistance of counsel.

*Id.* at 180, 106 S.Ct. 477 (emphasis supplied).

The Petitioner points to *Mealer v. Jones,* 741 F.2d 1451 (2d Cir.1984) to support his position that "the *Massiah* protection" extended to statements concerning the indicted offense made in the course of investigating into a "new crime." In *Mealer,* the defendant was indicted for murder in the second degree. The "new crime" was the attempted bribery of an eyewitness, who was cooperating with the district attorney. In its habeas decision, the district court held that the attempt to suborn perjury was an unrelated charge not yet under indictment and for which *Mealer's* right to counsel had not yet attached. Therefore, the district court concluded the use of those statements in *Mealer's* murder trial did not violate *Massiah.* However, the Court in *Mealer* held only that: "we conclude it was error for the Court to admit appellant's statements to Gaudet as they arose out of and concerned the offense for which *Mealer* was under indictment." *Id.* at 1454. In this regard, the Second Circuit referred to the so-called "new crime" in *Mealer* as follows:

> But the facts of this case demonstrate the fallacy of automatically treating as a similar windfall to the government any information it obtains during a "new crimes" investigation. The "new crime" under investigation here was Mealer's attempt to suborn perjury at the trial on his pending indictment. *That crime was intimately related to the pending indictment, and the government must have known that any statements made in the course of suborning perjury would nec-*

essarily incriminate Mealer on the murder charge as well. Under the circumstances, we decline to assume that merely because the government was put on notice by appellant that he contemplated a new crime, in empowering its agent to investigate that new crime the government lacked all designs to elicit information concerning the old. Indeed, given that the nature of the new crime proposed also put the government on notice that any discussion between Mealer and Gaudet would almost certainly incriminate Mealer on the old crime as well, we view this, if anything, as an even stronger case than *Beatty* for finding a violation of defendant's Sixth Amendment rights.

*Id.* at 1455.

 In this Court's view, there is no clear defining answer to the question of the Government-sponsored obtaining of statements from an indicted defendant, without counsel, in regard to "new crimes" and those "inextricably intertwined." The definition of a "new crime" is, apparently, an offense not related in any way to the indicted charges. In addition, it is clear that a "new crime" investigation that obtains statements referring to the indicted crimes, is precluded under the *Massiah* Rule. *See Beatty v. United States,* 389 U.S. 45, 88 S.Ct. 234, 19 L.Ed.2d 48 (1967) *rev'g,* 377 F.2d 181 (5th Cir.1967).

This rule as to new crimes that "relate" to the indicted offense is clearly said but has been interpreted with varying results in the courts. For example, in *Grieco v. Meachum,* 533 F.2d 713 (1st Cir.1976) it was held that "Cassesso's statements on the other hand, were primarily uttered in the commission of another substantive offense, subornation of perjury, and were only incidentally admissible in his trial on the pending indictment. Because of this distinction we find that Cassesso's Sixth

Amendment right to counsel was not violated by Glavin's conversations with him, nor by the introduction into testimony in his trial for the murder of Deegan." *United States v. Moschiano,* 695 F.2d 236 (7th Cir.1982) *cert. denied* 464 U.S. 831, 104 S.Ct. 110, 78 L.Ed.2d 111 (1983) is a case involving somewhat similar circumstances to the instant case. In *Moschiano,* involving a heroin conspiracy, the Court ruled on the admissibility of evidence of "new crimes":

"We adhere to this distinction between post-indictment statements relating to new criminal acts and post-indictment statements constituting admissions of past wrongdoing. The former are generally outside the protection of *Massiah* because no person has a constitutional right to the assistance of counsel while committing a crime. The latter type of statements are generally not admissible at trial on the pending indictment because they are the kind of utterances for which the assistance of counsel could legitimately play a useful role. In the instant case, Moschiano's post-indictment statements concerned a separate crime—the attempted purchase of Preludin tablets without a prescription—and were therefore unprotected by the exclusionary rule of *Massiah.*"

695 F.2d at 241–42.

However, in *Moschiano,* the Seventh Circuit expressed concern that "at least in egregious cases, *Massiah* would prohibit the use of evidence of post-indictment criminal activity under circumstances in which that evidence was procured not through an independent investigation into continuing or separate criminal activity but instead through a confrontation with government agents engineered for the purpose of creating evidence to use against the defendant at the trial of the indicted offenses." So, there is authority that

where the post-indictment evidence was not the product of an ongoing investigation to turn up "new crimes" but was arranged by the Government "to obtain from the defendant evidence of specific intent to shore up the government's case," that would be a *Massiah* violation. *See United States v. Anderson*, 523 F.2d 1192, 1195–96 (5th Cir.1975).

Another important Supreme Court decision that is enlightening on this subject is *McNeil v. Wisconsin*, 501 U.S. 171, 175, 111 S.Ct. 2204, 2207, 115 L.Ed.2d 158 (1991). In *McNeil*, it was held that the Sixth Amendment right to counsel is offense specific:

It cannot be invoked once for all future prosecutions, for it does not attach until the prosecution is commenced, that is, "at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *United States v. Gouveia*, 467 U.S. 180, 188, 104 S.Ct. 2292, 2297, 81 L.Ed.2d 146 (1984) (quoting *Kirby v. Illinois*, 406 U.S. 682, 689, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411 (1972) (plurality opinion)).

Another Second Circuit case of interest is *United States v. DeVillio*, 983 F.2d 1185, 1191 (2d Cir.1993). In *DeVillio*, five tapes that were admitted into evidence included discussions of two burglaries, one of which was not involved in the pending charges. It was held that there was no *Massiah* violation:

De Angelo and Spoto were not charged with the Bulova burglary as a substantive crime. As such, we find that the trial court's admission into evidence of certain portions of the September 1, 1987 conversation concerning the Bulova burglary was appropriate and that no *Massiah* violation occurred. *See McNeil v. Wisconsin*, 501 U.S. 171, 174–

75, 111 S.Ct. 2204, 2207, 115 L.Ed.2d 158 (1991). (Sixth Amendment right to counsel is "offense-specific" and "cannot be invoke once for all future prosecutions, for it does not attach until a prosecution is commenced"); *Alexander v. State of Connecticut*, 917 F.2d 747, 751 n. 1 (2d Cir.) (no *Massiah* violation in admitting into evidence conversation between friend who was visiting prisoner charged only with arson where inmate confided he had also committed murder and murder charges had not been filed) (citing *Moulton* ).

In this case the Petitioner contends that *"Massiah* will still bar the evidence when the charges are inexplicably intertwined", citing four cases from circuits other than the Second Circuit. A review of these cases reveals that none is determinative. In *United States v. Melgar*, 139 F.3d 1005, 1011 (4th Cir.1998), the Court determined that the defendant's post indictment incriminating statements should have been suppressed. The Court held that the statements were "inextricably intertwined" with the pending charges, and the questions to the defendant were closely related to those which his Sixth Amendment right has attached. However, the Court noted the general rule that:

incriminating statements pertaining to crimes "other" than the pending charges are admissible at trial on those charges, without discussing the closely related exception. However, neither case offered the Court any reason to do otherwise because the post-indictment interrogations in *McNeil* and *Moran* elicited information *only* as to the offenses *not* closely related to the charged offense. *See McNeil [v. Wisconsin]*, 501 U.S. [171,] 175, 111 S.Ct. 2204, [115 L.Ed.2d 158] (after charged with robbery in West Allis, defendant was interrogated (and later charged and convicted) of "un-

related, uncharged" offenses—a murder, attempted murder, and robbery in Caledonia) (internal quotations omitted); *Moran [v. Burbine]*, 475 U.S. [412,] 416, 106 S.Ct. [1135,] 1138 [89 L.Ed.2d 410] (after defendant was arrested in connection with a burglary in Cranton he was interrogated (and then charged) with an unrelated murder in Providence). *Moulton* is the sole instance in which the court has been presented with a post-indictment interrogation about two sorts of offenses in addition to those originally charged—one closely related to the originally charged offenses and one not. *Burglary of the auto parts was closely related to the originally charged theft of those same parts—both crimes occurred at the same time and place and involved the same victim and circumstances. The attempted murder, however, was planned at a different time and place, and involved a different victim, and so was not so closely related to the originally charged theft offenses.*

*Id.* at 1013 (Fn.1) (emphasis supplied).

In *United States v. Doherty*, 126 F.3d 769, 776 (6th Cir.1997), a case involving "precisely the same underlying conduct (that) formed the basis for both charges," the Court commented that, "The question of how 'inextricably intertwined' two offenses must be so that the Sixth Amendment right to counsel attaches simultaneously with respect to both offenses is open to some doubt, and we leave consideration of that question to another day."

In *United States v. Laury*, 49 F.3d 145, 149 (5th Cir.1995), the interrogation involved the charged robberies. In *United States v. Mitcheltree*, 940 F.2d 1329, 1341 (10th Cir.1991), the statements at issue were elicited "in an effort to lead the defendant into witness tampering" involving the pending charges.

In an important recent case, *United States v. Bender*, 221 F.3d 265 (1st Cir. 2000), the statements at issue concerned ways in which the defendant could illegally influence the outcome of his impending trial. There were two schemes discussed. The first involved the falsification of an alibi. The second involved the kidnaping and murder of Government witnesses who would testify against him. The statements were held to violate the *Massiah* Rule.

We disagree. The statements were incriminating not only as to future crimes (perjury, conspiracy to kidnap and murder) but also as to the pending charges. So long as the statements were incriminating as to the pending charges and were deliberately elicited by government agents, they cannot constitutionally be admitted in the trial of those charges. *Cf. Id.* at 180, 106 S.Ct. 477 (holding that the Sixth Amendment does not permit the introduction of directly incriminating statements obtained during the investigation of other crimes.)

*Id.* at 269.

 Here, the statements were solely incriminating as to the December 1989 drug transaction; nothing ever referred to or mentioned the pending crimes. There is no question that the December 20, 1989 drug transaction was a "new crime." However, upon reviewing all the authorities cited above, it is clear that the issue before the Court is whether the statements of the Petitioner, elicited by Agent Lum were "closely related," or were "inexplicably intertwined" with the crimes at issue. In this regard, the Petitioner points out that "the investigation report filled out by Lum used the case number for the instant offense"; the Petitioner was never indicted with regard to the subsequent acts; Lum is a federal agent, which is the same prosecuting body and "they were only used to bolster the Government's case

in the instant trial". Petitioner asserts that Lum's interest was "nothing more than an attempt to obtain incriminating information" in violation of the Petitioner's Sixth Amendment right to counsel. He concludes that had former counsel raised this issue prior to trial, it would have resulted in suppression of the evidence.

A review of the evidence and the cases reveals that there was no *Massiah* violation. First, other than the fact that the same case number was used, there is no evidence that the December 20, 1989 aborted drug transaction was a "closely related crime" or was "inexplicably intertwined" with the March 14, 1989 criminal conduct. The December 1989 incident was an unrelated uncharged transaction. There is no evidence that Agent Lum attempted, in any manner, to obtain statements from the Petitioner pertaining to the crimes at issue.

Therefore, the Court finds that this December 1989 purported drug transaction was not a "closely related" crime nor was it "inexplicably intertwined" with the crimes at issue; it was a "new crime." Accordingly, there was no *Massiah* violation, and had counsel raised this issue, it would have been of no avail. There was no ineffective assistance of counsel in the failure to raise the *Massiah* issue.

## II. *The Lum Appearance and Testimony were Independently Admissible as Impeachment Evidence*

The Lum testimony concerning the December 20, 1989 incident was properly admitted as impeachment evidence. At the trial, the Petitioner took the stand in his own defense. The Petitioner testified that he was entrapped into entering into the March 14, 1989 drug deal and that this was his only contact with drug dealing. It was on cross-examination that Lum was brought into the Courtroom, and then he testified in the Government's rebuttal case.

As the Court set forth at length in the November 5, 2001 decision, the Government had the right to use the statements adduced at the December 20, 1989 incident as impeachment evidence with regard to a specific falsehood. *See United States v. Havens*, 446 U.S. 620, 626–27, 100 S.Ct. 1912, 1916, 64 L.Ed.2d 559 (1980) ("It is essential … to the proper functioning of the adversary system that when a defendant takes the stand, the government be permitted proper and effective cross-examination in an attempt to elicit the truth"); *United States v. Payton*, 159 F.3d 49, 58 (2d Cir.1998) ("When a defendant offers an innocent explanation he 'opens the door' to questioning into the truth of his testimony, and the government is entitled to attack his credibility on cross-examination"); *United States v. Garcia*, 936 F.2d 648, 651 (2d Cir.1991) ("Once [defendant] Dominiguez testified that he had no idea that the white powder was cocaine, he opened the door for the Government to impeach his testimony by establishing on cross-examination that he was familiar with and indeed had used cocaine as recently as the day before his arrest."); *United States v. Beverly*, 5 F.3d 633 (2d Cir.1993) ("Where a defendant testifies on direct about a specific fact, the prosecution is entitled to prove on cross-examination that he lied as to that fact. *Garcia*, 936 F.2d at 653. The same holds true for defendant's false statements on cross-examination. *United States v. Atherton*, 936 F.2d 728, 734 [2d Cir.1991]. Finally, the government's opportunity to impeach the defendant's credibility once he has taken the stand includes the opportunity to use evidence that it was barred from using on its direct case. *Atherton*, 936 F.2d at 734.")

In a somewhat similar legal mold, it is well settled that statements taken in violation of the *Miranda* Rule are admissible to

# 273

impeach a defendant on the stand. This rule was clearly enunciated in *Michigan v. Harvey,* 494 U.S. 344, 350–51, 110 S.Ct. 1176, 1180, 108 L.Ed.2d 293 (1990):

> The prosecution must not be allowed to build its case against a criminal defendant with evidence acquired in contravention of constitutional guarantees and their corresponding judicially created protections. But use of statements so obtained for impeachment purposes is a different matter. If a defendant exercises his right to testify on his own behalf, he assumes a reciprocal "obligation to speak truthfully and accurately," *Harris, supra,* 401 U.S., at 225, 91 S.Ct., at 645, and we have consistently rejected arguments that would allow a defendant to " 'turn the illegal method by which evidence in the Government's possession was obtained to his own advantage, and provide himself with a shield against contradiction of his untruths.' " *Id.* at 224, 91 S.Ct., at 645 (quoting *Walder v. United States,* 347 U.S. 62, 65, 74 S.Ct. 354, 356, 98 L.Ed. 503 (1954)). *See also [Oregon v.] Hass, supra,* 420 U.S. [714,] 722, 95 S.Ct. [1215,] 1220–21, [43 L.Ed.2d 570]; *United States v. Havens,* 446 U.S. 620, 626, 100 S.Ct. 1912, 1916, 64 L.Ed.2d 559 (1980).

Finally, the Court finds that no evidentiary hearing on the *Massiah* issue is required. As noted in the Court's November 5, 2001 decision, when "[t]he files and records of the case conclusively show that the Petitioner is entitled to no relief," there need be no hearing. 28 U.S.C. § 2255. The issues of fact in this case were sufficiently adduced at the trial and contained in the voluminous transcripts. This is especially compelling in that this Court presided over the trial. *See Machibroda v. United States,* 368 U.S. 487, 495 n. 4, 82 S.Ct. 510, 7 L.Ed.2d 473 (1962); *Chang v. United States,* 250 F.3d 79, 84–86 (2d Cir.2001). This determination is especially viable in this case, where the evidence was used only as impeachment of the petitioner and on rebuttal—a clearly permissible use of the evidence.

## CONCLUSION

In sum, the Court finds that there was no ineffective assistance of Petitioner's trial counsel in failing to object to the Lum evidence based on the *Massiah* Rule. The Court notes, however, that trial counsel for the Petitioner did object to the admission of this evidence on other grounds, which objection was properly overruled. The Government's use of this evidence in the manner it did, to impeach the testifying petitioner did not violate the Sixth Amendment or the Supreme Court's *Massiah* holding.

Based on the foregoing, and additional reasons set forth in the Court's November 5, 2001 decision, the petition is denied in all respects. Further, having considered the standards for a certificate of appealability under Fed.R.App.Pro.22(b) and 28 U.S.C. § 2253(c)(2), as set forth in *Barefoot v. Estelle,* 463 U.S. 880, 893 n. 4, 103 S.Ct. 3383, 3395 n. 4, 77 L.Ed.2d 1090 (1983) and *Lucidore v. New York State Div. Of Parole,* 209 F.3d 107, 112 (2d Cir.2000), the Court finds that the petitioner has not made a substantial showing of a denial of a constitutional right. Accordingly, the Court finds that the Petitioner is not entitled to a certificate of appealability.

Accordingly, the petition is dismissed and the Clerk of the Court is directed to close this case.

**SO ORDERED.**